774 A.2d 1193

**In re RYAN S.**

**Nos. 6881, Sept. Term, 1998 and 427, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

June 29, 2001.

Bradford C. Peabody, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellants, in No. 6881, Sept. Term, 1998.

Thomas G. Witkop, Rockville, for co-appellant, Linda S., in No. 427, Sept. Term, 1999.

Celia Anderson Davis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Robert Dean, State's Attorney for Montgomery County, Rockville, on the brief), for appellee.

Argued before WENNER,* KRAUSER and ROBERT F. FISCHER (Retired, specially assigned), JJ.

---

* Wenner, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

KRAUSER, Judge.

Following a six-day adjudicatory hearing conducted intermittently over a four-month period, Ryan S. was found to be a delinquent child by the District Court of Maryland for Montgomery County, sitting as a juvenile court, for stabbing Ronnie Wayne Dent. Ryan was placed on probation, and he and his mother, Linda S., were ordered by the court to pay $10,000.00 in restitution to Kaiser Permanente for medical expenses it had paid on Dent's behalf.

From that adjudication of delinquency, Ryan noted an appeal. He also noted an appeal from the order of restitution, as did Linda S. All appeals were subsequently consolidated for consideration by this Court.

Ryan presents three issues for our review; Linda S. only one (Issue III). As rephrased by this Court, they are:

I. Did the juvenile court err in denying Ryan's motion to dismiss, and his motion, in the alternative, for a mistrial?

II. Did the juvenile court err in preventing Ryan from cross-examining the complainant regarding acts of violence more than twenty years old?

III. Did the juvenile court err in ordering Ryan and Linda S. to pay restitution in the amount of $10,000.00?

Finding no error, we shall affirm.

### Background

On August 20, 1998, the State's Attorney for Montgomery County filed a juvenile petition charging Ryan with first degree assault, reckless endangerment, and carrying a weapon openly with intent to injure, for stabbing Ronnie Wayne Dent on February 4, 1998. An adjudicatory hearing was held over a four-month period on the following dates: September 10 and 11, 1998, December 14 and 15, 1998, and January 13 and 21, 1999. When that hearing ended, appellant was found "not involved on first degree assault," but found involved on the

following charges: second degree assault, reckless endangerment, and carrying a weapon openly with intent to injure.

Ryan was seventeen years old when the adjudicatory hearing began. He was born on November 14, 1980, to Linda S., with whom he currently resides, and Elmer Baker, who died on September 15, 1995. Ryan attended Richard Montgomery High School until he dropped out during his second year in the ninth grade.

Dent, who was forty-nine years old at the time of the adjudicatory hearing, was a first cousin and a friend of Ryan's father. While his father was alive, Ryan got along well with Dent and went fishing and hunting with him and his father.

After the death of Ryan's father, Dent regularly visited Linda S. to "help out around the house" and "do yard work." Eventually, the two became sexually involved. At that point, Ryan objected to their relationship as Dent was a family member and had a wife and children of his own. Ryan repeatedly expressed his displeasure to his mother and Dent. According to Dent, Ryan threatened on several occasions that "he was going to kill [him.]" Despite Ryan's protests, the relationship continued.

### Hearing Testimony

At the adjudicatory hearing, Dent testified that, on the evening of February 4, 1998, he was outside his aunt's house when Ryan approached him and asked if he could speak with him. Dent replied that he would stop by Ryan's house later. When he later arrived at Ryan's house, he was confronted by Ryan who stated that he was "tired of [Dent] coming around here, seeing [his] Mom." When Ryan began to yell at Dent, Dent walked into the house and told Linda S., "your son acting crazy again."

Dent further testified that while he was sitting at the kitchen table, Ryan entered the room, opened a kitchen drawer, and pulled out a butcher knife. As Ryan turned toward him, Dent grabbed a vacuum cleaner, raising it to his shoulder in self-defense; at that point, Linda S. jumped between the

two men. As Dent put down the vacuum cleaner, Ryan came up behind him and stabbed him in the "back, on the side."

In contrast to Dent's testimony, Linda S. and Ryan testified that Dent picked up the vacuum cleaner first, and that Ryan picked up the knife to protect himself from Dent. They both claimed that Dent, after putting the vacuum cleaner down, charged at Ryan, picking him up and throwing him to the ground. A scuffle ensued, and Dent was stabbed. As a result of the injuries he sustained, Dent was hospitalized for approximately three months. During part of that time, he was comatose and was later fitted with a colostomy bag.

After stabbing Dent, Ryan fled with the knife, and eluded the police for three months. He finally turned himself in on May 11, 1998.

In addition to Ryan, Dent, and Linda S., eight other witnesses testified at the adjudicatory hearing; none of whom actually witnessed the stabbing. Among them were two former girlfriends of Dent, Onerlin Bledsoe and Betty Johnson. Both Bledsoe and Johnson testified as to Dent's violent character and as to specific instances when Dent hit them and their children.

A ninth witness, George Long, died before testifying at trial. The parties, however, stipulated to his testimony. That stipulation stated that Long, a neighbor of Ryan's, told police that he arrived home around 7:45 on the evening of February 4th. Seeing Dent sitting in his truck in Linda S.'s driveway, Long approached him and spoke with him briefly. Dent told Long that Ryan was inside with his mother.

A little later, Ryan emerged from the house, walked past Long, and said "hi." According to Long, "Ryan appeared normal." Long then went into his house. He did not see or hear anything else until "Linda came banging on his door." When he got to the door, Linda S. said, "hurry, hurry, Ronnie's been stabbed by Ryan." He then ran to her house where he saw Dent lying on the floor, bleeding.

### Procedural History

On May 14, 1998, three days after turning himself into the police, Ryan appeared before the District Court of Maryland for Montgomery County, sitting as a juvenile court. The court ordered him detained at the Alfred D. Noyes Children's Center pending a "reverse waiver" hearing in "adult court" to determine whether to send his case back to juvenile court. That hearing was held on August 14, 1998, and Ryan's case was referred back to the juvenile court.

On August 20, 1998, the State's Attorney for Montgomery County filed a petition in the juvenile court, charging Ryan with first degree assault, reckless endangerment, and carrying a weapon openly with intent to injure. In that petition, the State sought restitution from appellants for medical expenses in the amount of $10,000.00, the statutory maximum. Ryan remained at the Noyes Children's Center pending an adjudicatory hearing on that petition.

The adjudicatory hearing was scheduled for September 10 and 11, 1998. When the hearing exceeded its allotted time, it was continued for approximately ninety days, to December 14 and 15, 1998, the next available dates. Because of that delay, Ryan requested that he be released and placed on home electronic monitoring pursuant to Maryland Rule 11–114(b)(2). That rule provides that "[i]f an adjudicatory hearing is not held within thirty days [from the date on which the court ordered continued detention], the respondent shall be released on the conditions imposed by the court pending an adjudicatory hearing." Noting the serious nature of Dent's injuries and Ryan's three-month-long flight from the police, the court denied that request.

When Ryan objected to the court's decision to continue his detention, the court advised him to file a motion for an expedited hearing. Instead, Ryan filed a petition for a writ of habeas corpus in the Circuit Court for Montgomery County. The circuit court thereupon ordered that either a hearing be scheduled within thirty days of September 10, 1998, or Ryan be released on September 17, 1998. In response to that order,

the district court held a hearing on September 16, 1998. Following that hearing, it ordered that Ryan be released on home electronic monitoring to the care and custody of his mother. The court, however, did not reschedule the adjudicatory hearing to an earlier date, as no request to do so was ever made.

The adjudicatory hearing resumed on December 14 and 15, 1998. On December 14th, Ryan moved for a mistrial solely on the ground that the tapes of the earlier proceedings were unintelligible and, therefore, he could not adequately prepare for his re-cross-examination of Dent. No objection was made to the three-month delay in resuming the adjudicatory hearing.

After listening to the master tapes and determining that, aside from being "somewhat fuzzy" at times, the tapes were otherwise clear, the court denied that motion with the understanding that Ryan's counsel would be afforded the opportunity to review the master tapes before Dent resumed testifying. The court then recessed to allow counsel to review those tapes.

At the conclusion of that day, the court discussed with counsel the scheduling of the case. After the State indicated that it would probably be able to complete its case by the following morning, the court asked defense counsel how long their case would take. Defense counsel responded, "It's hard to say Judge, I don't know." Then the following exchange between the court and defense counsel occurred:

COURT: Well we're, I'm going to have to get some idea, because if it can't be concluded tomorrow afternoon, then we've got to do something.

[DEFENSE COUNSEL]: Can we decide that tomorrow?

COURT: Yeah, but I want to be, I would like to address it around lunch time tomorrow.

[DEFENSE COUNSEL]: Okay.

COURT: Okay? I mean, I know you want to play the cards . . .

[DEFENSE COUNSEL]: (Unclear)

COURT: Close to the vest, but I also have to worry about administration of the Court, and all the problems that you legitimately raised today. So, the sooner we can know about finding out the times the better, if necessary.

The next day, December 15, 1998, the court once again raised the scheduling issue with counsel, when it became apparent that the case would not conclude on that date. No objection was made by defense counsel to continuing the hearing to January 13, 1999. In fact, counsel for Ryan and Linda S. stated that January 13th was "fine" with them. The court suggested to counsel that, when the case resumed on January 13th, the proceedings last until 8:00 p.m., if necessary, to conclude the hearing. The following exchange then occurred:

[ONE DEFENSE COUNSEL]: Yeah, that's fine. We're not complaining, we're happy. Are we happy? Oh, we're not happy.

COURT: Well, I got some bad body language.

[THE OTHER DEFENSE COUNSEL]: I just made a face about the eight o-clock part.

COURT: We have to, we have to finish this case in one more trial session, we really do.

When the hearing resumed on January 13, 1999, Ryan moved for a mistrial, alleging for the first time a denial of his right to a fair trial because of the protracted and disjointed nature of his adjudicatory hearing. As alternative relief, he requested that the court "review, or listen to the entire tape of the proceedings in this matter." In support of that motion, Ryan argued that: (1) home electronic monitoring was equivalent to detention; (2) portions of the master tapes of the proceedings were unintelligible; and (3) the court and the parties could not have possibly remained focused on the case during the extended delays.

Denying that motion, the court stated, "I have been taking very good notes in the case, and if ... when it comes down to it, I don't feel that I[can] make a decision without reviewing

the tapes, I will do so." The court also stated that because of the court's crowded docket, it was impossible to continue the case on a day-to-day basis. The hearing then concluded on that date, and the court deferred its ruling until January 21, 1999.

When the proceedings resumed on January 21, 1999, Ryan renewed his motion for mistrial and also moved to dismiss the charges. Among other things, Ryan argued that he was prejudiced by the four-month delay in the proceedings because George Long, a defense witness, had died before he could testify. When the court asked why this issue had not been raised at the December hearing, defense counsel stated, "I didn't make a motion for a mistrial then Judge, I should have, but I didn't. But I'm raising it because of the way that the case has been conducted." The parties ultimately stipulated to what Long's testimony would have been had he testified.

Denying both motions, the court stated "witnesses can expire at any time, during a trial, and the mere fact that a witness expires is not automatically grounds for a mistrial." The court continued: "[H]ere you certainly have been able to accomplish more than would normally be the case with a witness who expired insofar as you were able to get by stipulation the testimony of that witness."

Addressing the four-month delay in concluding the hearing, the court stated: "I find that there was extraordinary cause for the matter not to have been concluded ... on September 11th, and that ... the various reschedulings of the case were for no reason other than the Court's calendar simply could not possibly accommodate it."

As for Ryan's claim that the court would not be able to remember the testimony of all of the witnesses because of the passage of time, the court stated: (1) that it had reviewed portions of the taped proceedings "that [it] felt to be crucial to making a determination," namely, the testimony of Dent and Linda S. recounting the events of February 4, 1998; (2) that although it had not listened to Ryan's taped testimony, it "had

heard [that testimony] live, just only a week ago;" (3) that the testimony of Ryan's witnesses "was very fresh" in its memory; and (4) that it had reviewed the extensive notes it had taken during trial.

After discussing at length the testimony of Ryan, Linda S., and Dent and the inconsistencies in their testimony, the court found Ryan not involved in first degree assault but involved in second degree assault, reckless endangerment, and in carrying a weapon openly with intent to injure. On February 11, 1999, Ryan appealed that finding to this Court.

A disposition hearing was held on February 4, 1999, and Ryan was placed on probation "with all the standard conditions," and special conditions of "meet[ing a] counselor as directed," "obey[ing] all rules of the home," "maintain[ing] employment as directed," "200 Hours" of community service, "be[ing] released in the care and custody of his mother on Home Electronic Monitoring," "obtain[ing] his GED," "participat[ing] in individual counseling and submit[ting] to urinalysis under the direction of the department," and having "NO CONTACT with Ronnie Dent and his family at anytime."

On April 26, 1999, the district court held a hearing on the State's petition, requesting restitution on behalf of Kaiser Permanente, Dent's health insurance company, for the $300,000.00 in medical expenses Kaiser Permanente had paid on behalf of Dent. At the conclusion of that hearing, the court "award[ed] restitution in favor of Kaiser Permanente in the amount of $10,000.00, jointly and severally against Ryan and [Linda S.]." Ryan appealed that decision on April 29, 1999, and Linda S. appealed it on May 27, 1999. All appeals were subsequently consolidated.

## Discussion

### I

Ryan contends that the juvenile court erred in denying his motion to dismiss or, in the alternative, for a mistrial, on the grounds that his protracted and disjointed adjudicatory hearing denied him due process, violated Maryland Rule 11–114,

and offended notions of "fundamental fairness." He further contends that he was prejudiced by the lengthy delays of his adjudicatory hearing because:

■ a defense witness died in the interval;

■ "home electronic monitoring is really the equivalent of detention [and] a serious restriction on ... the liberty of a person," who cannot work or go to school;

■ the hearing was not "completed with a reasonable degree of continuity;"

■ the delay necessarily affected the judge's ability "to remember the witness' behavior, how the witness testified, to really judge the credibility of the witness;"

■ a judge's notes on testimony were an inadequate substitute for hearing the "entire" proceedings; and

■ the copy of the tape recording of the proceedings which was made available for the defense to prepare for the continued hearing was "unintelligible."

Maryland Rule 11–114 governs juvenile adjudicatory hearings. As to the scheduling of such hearings, that rule provides:

b. **Scheduling of hearing.** 1. Adjudicatory hearing. An adjudicatory hearing shall be held within sixty days after the juvenile petition is served on the respondent unless a waiver petition is filed, in which case an adjudicatory hearing shall be held within thirty days after the court's decision to retain jurisdiction at the conclusion of the waiver hearing. However, upon motion made on the record within these time limits by the petitioner or the respondent, the administrative judge of the county or a judge designated by him, for extraordinary cause shown, may extend the time within which the adjudicatory hearing may be held. The judge shall state on the record the cause which requires an extension and specify the number of days of the extension.

2. Prehearing detention or shelter care. If the respondent is in detention or shelter care, the adjudicatory hearing

shall be held within thirty days from the date on which the court ordered continued detention or shelter care. If an adjudicatory hearing is not held within thirty days, the respondent shall be released on the conditions imposed by the court pending an adjudicatory hearing, which hearing shall be held within the time limits set forth in subsection 1 of this section.

Ryan's "reverse waiver" hearing was held on August 14, 1998. Because subsection (b)(1) of Rule 11–114 requires that an adjudicatory hearing "be held within thirty days . . . of the waiver hearing," Ryan's hearing was scheduled for September 10, 1998. While the adjudicatory hearing did begin on that date, it did not conclude until January 21, 1999, over four months later.

Although we have not previously considered the thirty-day hearing requirement of subsection (b)(1), we have interpreted that requirement in the context of subsection (b)(2) of that rule, where it also appears. In *In re Vanessa C.*, 104 Md.App. 452, 656 A.2d 795 (1995), the District Court of Maryland for Montgomery County, sitting as a juvenile court, found the daughter of a psychologically disturbed woman to be a child in need of assistance ("CINA"). *Id.* at 457, 656 A.2d 795. In compliance with the thirty-day requirement of subsection (b)(2), the adjudicatory hearing in that case began within thirty days of the shelter care hearing. *Id.* at 456, 656 A.2d 795. Unfortunately, it was scheduled on the thirtieth day, and when it did not conclude on that day, Vanessa's mother objected to a continuance of that hearing on the ground that any continuance would violate the thirty-day requirement of subsection (b)(2). *Id.* The court nonetheless continued the hearing for one month, and then later, continued the hearing again, over objection, for another month after that. *Id.* at 456, 656 A.2d 795.

On appeal, Vanessa's mother renewed her claim that the delays in the proceedings violated her right to an adjudicatory hearing within thirty days of the order placing her daughter in shelter care, pursuant to subsection (b)(2) of Rule 11–114. *Id.*

at 457, 656 A.2d 795. We subsequently determined that "held" in the context of subsection (b)(2) did not "mean completed, but, rather that the hearing [must] be initiated within thirty days and completed with a reasonable degree of continuity." *Id.* at 459, 656 A.2d 795. "A reasonable degree of continuity," we declared, required "that a hearing once begun must continue, insofar as possible, on a day to day basis until completed." *Id.*

As in *In re Vanessa C.*, this case is also an appeal from juvenile court based on the failure to provide a juvenile with a hearing that displays "a reasonable degree of continuity." The only difference is that we are now asked to address the thirty-day requirement of subsection (b)(1) of that Rule, which governs delinquency proceedings, instead of the thirty-day requirement of subsection (b)(2), which governs both CINA and pre-hearing detention proceedings.

There is no logical reason to treat the thirty-day requirement of subsection (b)(1) any differently than the thirty-day requirement of subsection (b)(2). Children charged with criminal offenses are as entitled to a prompt hearing as children in need of "shelter care." Indeed, an unwarranted adjudicatory delay not only places juvenile offenders in the same unsettling limbo as their CINA counterparts, but it may impair their right to a fair trial as well. For these reasons, such delays undermine "the overriding goal of Maryland's juvenile statutory scheme ... to rehabilitate and treat delinquent juveniles so that they become useful and productive members of society." *In re Keith W.*, 310 Md. 99, 106, 527 A.2d 35 (1987); *see also* Md.Code (1973, 1998 Repl.Vol., 2000 Supp.), § 3–802 of the Cts. & Jud. Proc. Article (stating the purposes of the juvenile delinquency statute). Therefore, in accordance with *In re Vanessa C.*, we conclude that once an adjudicatory hearing pursuant to subsection (b)(1) has begun, it must be completed with a reasonable degree of continuity, that is, insofar as possible on a day-to-day basis until completed.

Moreover, Rule 11–114(b)(1) only permits the court to extend the time within which to hold an adjudicatory hearing for "extraordinary cause." This Court previously considered the phrase "extraordinary cause" in *Guarnera v. State,* 20 Md. App. 562, 318 A.2d 243 (1974), a criminal case involving an alleged denial of Guarnera's right to counsel because the court would not reschedule his trial to allow him time to obtain new counsel. In that case, we stated:

When the Legislature has expressed the will of the people by saying that the date established for the trial of a criminal case shall not be postponed except for extraordinary cause ... the message should be loud and clear to the bench, the bar, parties, witnesses, and to the public, that *trials must not and will not be postponed for ordinary reasons.*

*Id.* at 573–74, 318 A.2d 243 (emphasis added); *see also State v. Hicks,* 285 Md. 310, 319, 403 A.2d 356 (1979)(stating that extraordinary cause "[c]learly ... is cause beyond what is ordinary, usual or commonplace; it exceeds the common order or rule and is not regular or of the customary kind").

In the case *sub judice,* the court's "extraordinary cause" to postpone the adjudicatory hearing was an overcrowded docket. In light of how common that problem appears to be in Montgomery County, we can hardly conclude that an overcrowded docket constitutes "extraordinary cause." *See In re Vanessa C.,* 104 Md.App. at 459, 656 A.2d 795 (stating that "[t]he evil sought to be avoided is the present practice, at least in Montgomery County, of continuing cases ... for periods as long as thirty days, thereby prolonging the [child in need of assistance] determination for from three to five months in some cases"). Without a more compelling reason, an overcrowded docket alone does not provide a basis for repeatedly continuing the adjudicatory hearing of a juvenile offender. *See State v. Frazier,* 298 Md. 422, 458, 470 A.2d 1269 (1984)(considering what constituted extraordinary cause for postponement of criminal cases and stating that "it was arguable that, as a matter of law, overcrowded dockets did not constitute sufficient cause for a postponement").

Although we are concerned about the protracted and disjointed nature of the proceedings in this case, we hold that Ryan's failure to timely raise the continuity argument below has resulted in a waiver of that issue on appeal. The failure to object at trial to a ruling, when the court has the power to correct the alleged error, constitutes a waiver of that objection for appellate review. *See* Md. Rule 8–131(a); *In re Tyrek S.,* 118 Md.App. 270, 273–74, 702 A.2d 466 (1997)(applying Maryland Rule 8–131 to juvenile delinquency proceedings and holding that argument not raised below waived on appeal); *Brecker v. State,* 304 Md. 36, 40, 497 A.2d 479 (1985) (failure to timely object to court ruling constitutes waiver); *Caviness v. State,* 244 Md. 575, 578, 224 A.2d 417 (1966)("[U]nless a [party] makes timely objections in the lower court or makes his feelings known to that court, he will be considered to have waived them and he can not now raise such objections on appeal."); *Basoff v. State,* 208 Md. 643, 650, 119 A.2d 917 (1956)("When a party has the option either to object or not to object, his failure to exercise the option while it is still within the power of the trial court to correct the error is regarded as a waiver of it estopping him from obtaining a review of the point or question on appeal.").

In this case, Ryan did not timely object to the court's continuances and thus waived that issue for appellate review. The court set Ryan's adjudicatory hearing for September 10 and 11, 1998, and, after the second day, Ryan, who had been held at Noyes Children's Center since May 11, 1998, requested that he be released on home electronic monitoring because his hearing was continued until December 14, over three months later. Ryan argued that he was entitled to be released if the court did not complete the hearing within thirty days. The court initially denied his release request but, after the circuit court granted Ryan's habeas corpus petition, the district court released Ryan to his mother's care.

The record shows that Ryan objected to the delay of his adjudicatory hearing solely on the ground that he was being detained at the Noyes Children's Center in violation of Rule 11–114(b)(2). He did not at that time claim that such a delay

constituted a violation of due process or a violation of subsection (b)(1) of that Rule. In fact, Ryan never moved for an expedited hearing, as the circuit court had originally suggested he do, nor did he move, at that time, for a mistrial based on Rule 11–114(b)(1).

The hearing then resumed on December 14, 1998, and Ryan moved for the first time for a mistrial, but only on the ground that the tape of the proceedings provided to him was unintelligible. He again did not raise the argument that the continuance violated his right to a fair trial. In fact, at that time, the court, not defense counsel, raised the scheduling issue, stating: "I know you want to play the cards . . . [c]lose to the vest, but I also have to worry about administration of the Court, and all the problems that you legitimately raised today. So, the sooner we can know about finding out the times the better, if necessary." No concern was expressed by Ryan over the hearing delays.

On December 15th, the court again addressed scheduling matters. Defense counsel expressly stated that a continuance until January 13, 1999, was "fine." In fact, one of the two counsel stated that "we're happy" with that schedule, while the other expressed displeasure at the thought of staying late on January 13th to complete the hearing but did not object to the delay.

Nonetheless, when the hearing resumed on January 13th, Ryan moved for a mistrial, arguing for the first time that the hearing delays violated his right to a fair trial. As alternative relief, however, Ryan requested that the court listen to the tapes of the proceedings before rendering a decision. The court denied that motion but did listen to the taped testimony of Linda S. and Dent before rendering its decision.

Ryan again renewed his motion for a mistrial on January 21, 1999, and this time also moved to dismiss the charges. After determining that there was "extraordinary cause" to justify the repeated continuances of his case, namely, the "Court's calendar simply could not possibly accommodate it," the court denied both motions. Although Ryan argued that he was

prejudiced by the delay, because George Long, a defense witness, had died before he could testify, Ryan did not make that claim during or even immediately after that continuance. Furthermore, both parties stipulated to Mr. Long's testimony, thereby mitigating any prejudice caused by the loss of that witness. Moreover, Mr. Long was not an eyewitness to the stabbing. He could only testify to events that occurred before and after the stabbing, which shed little light on the central issue of the case—whether Ryan was acting in self-defense when he stabbed Dent.

In the case *sub judice*, Ryan waited until January 21, 1999, following five days of testimony and two continuances, to move unconditionally for a mistrial or a dismissal of his case. By waiting to object to the disjointed hearing procedure until the final day of the adjudicatory hearing, when all that remained was the court's ruling, Ryan gave the court no opportunity to " 'possibly correct any errors in the proceedings.' " *State v. Bell*, 334 Md. 178, 189, 638 A.2d 107 (1994)(quoting *Clayman v. Prince George's County*, 266 Md. 409, 416, 292 A.2d 689 (1972)). Had Ryan filed a motion for expedited hearing, as the circuit court had suggested on September 11, 1998, or moved earlier for a mistrial or dismissal, the circuit court could have addressed his concerns and rescheduled his case to an earlier date.

Moreover, in *In re Keith W.*, 310 Md. 99, 527 A.2d 35 (1987), the Court of Appeals considered the appropriate sanction for noncompliance with the time limitation for juvenile adjudicatory hearings. *Id.* at 106, 527 A.2d 35. In that case, Keith W. was found to have been involved in possession of marijuana with intent to distribute. *Id.* at 101, 527 A.2d 35. Keith W. appealed that decision, arguing that his juvenile petition should have been dismissed because, despite his timely objections, his adjudicatory hearing was continued to a date more than thirty days after his waiver hearing in violation of Maryland Rule 914 (the predecessor to Rule 11–114). *Id.* The Court of Appeals, however, disagreed, stating that "the purpose of Maryland's juvenile statute is not ordinarily best served by dismissal of the proceedings." *Id.* at 106, 527 A.2d

35. It declared that "[o]nly the most extraordinary and egregious circumstances should be allowed to dictate dismissal as the sanction for this violation of a procedural rule." *Id.* at 109, 527 A.2d 35. Therefore, had Ryan preserved his continuity argument, the appropriate remedy would not necessarily have been dismissal of his juvenile petition.

Moreover, the extended nature of appellant's adjudicatory hearing ultimately did not prejudice appellant. Before rendering a decision, the court listened to the taped testimony of Dent and Linda S. and reviewed the extensive notes it had taken. Furthermore, the testimony of Ryan S. was still "fresh in [the court's] mind" as Ryan had testified only a week before, on January 13th. And finally, the lengthy decision issued by the circuit court demonstrated that it had a firm grasp on the facts of this case when it rendered its decision.

In fact, as unfortunate as the delays in this case were, the failure of defense counsel to make timely objections to the delays or to move for an expedited hearing is not necessarily attributable to misjudgment or neglect. It may well have been part of a deliberate strategy to maximize the time that Ryan spent back on the street to show that he posed no threat to public safety and that no purpose would be served by reincarcerating him. We are not unmindful of the fact that frequently in juvenile proceedings defense strategy is more focused on the juvenile's disposition hearing than on his or her adjudicatory hearing.

## II

██ Ryan contends that the court erred in limiting his cross-examination of Dent as to Dent's past violent behavior. Specifically, appellant wanted to question Dent about violent acts Dent had committed: "(1) in 1973, against his former wife, their daughter, and his father-in-law; (2) in 1980, against other men, women, and girlfriends in the presence of children; (3) in 1979, against another girlfriend; and [ (4) ] in 1975, against his own son Ronnie, Jr." The court ruled that "going back twenty-five years, and even going back twenty years is

just so remote that ... that's not going to be helpful in addressing those issues, in this case involving an incident that occurred in 1998." The court, however, did permit Ryan to cross-examine Dent about incidents that occurred eight years earlier when he allegedly hit two former girlfriends and their children. Ryan maintains that the court's ruling, nevertheless, was error because "the Rule [regarding character evidence] does not arbitrarily limit such character evidence to eight years in the past."

 Maryland Rule 5–404(a)(1) states, in part, that character evidence is generally "not admissible for the purpose of proving action in conformity therewith on a particular occasion, except" when the evidence is "of a pertinent trait of character of the victim of the crime offered by an accused...." Md. Rule 5–404(a)(1)(B). A trial court's decision to admit or exclude character evidence of the victim lies within its sound discretion. *See Durkin v. State*, 284 Md. 445, 453, 397 A.2d 600 (1979)(holding that as to character testimony, "much deference will be paid to [the trial court's] determination, and it will be overturned on appeal only if there is a clear abuse of discretion"). In addition, as with all evidence, character evidence must be relevant to be admitted, and the trial court, in its discretion, determines relevance. *See Conyers v. State*, 354 Md. 132, 176, 729 A.2d 910 (1999).

In this case, the court permitted Dent's former girlfriends, Onerlin Bledsoe and Betty Johnson, to testify about his violent nature. They described the times that Dent hit them and their children. The court also permitted Ryan to cross-examine Dent about those incidents but drew the line at violent acts more than twenty years old, stating they were "just so remote." Consequently, we find that the court did not abuse its discretion in prohibiting testimony or cross-examination as to such acts, particularly when the evidence was clearly cumulative.

### III

Appellants contend that the court erred in ordering that they pay, jointly and severally, $10,000.00 in restitution to

Kaiser Permanente. Specifically, they argue that: (1) they do not have the ability to pay the judgment; (2) restitution is inappropriate in this case because of extenuating circumstances; and (3) an insurer may be awarded restitution only when it directly compensates the victim, which did not occur in this case. We disagree.

"The court may enter a judgment of restitution against the parent of a child, the child, or both as provided under Article 27, § 807 of the Code." Md.Code Ann. (1973, 1998 Repl.Vol.), § 3–829 of the Cts. & Jud. Proc. Article. Article 27, § 807 provides, in part:

### § 807. Restitution for crimes.

(a) *Restitution upon conviction, acceptance of plea of nolo contendere, etc.; priority of payment; reasons for not ordering restitution.*—(1) A court may issue a judgment of restitution directing a defendant to make restitution in addition to any other penalty for the commission of a crime, if:

\* \* \*

(ii) The victim suffered actual medical, dental, hospital, counseling, funeral, burial expenses, any other direct out-of-pocket losses, or loss of earnings as a direct result of the crime;

\* \* \*

(4) A court need not issue a judgment of restitution under this section if the court finds:

(i) That the defendant or liable parent does not have the ability to pay the judgment of restitution; or

(ii) Good cause to establish extenuating circumstances as to why a judgment of restitution is inappropriate in a case.

(5) The court may order that restitution be made to:

* * *

(iii) A third-party payor, including an insurer, which has made payment to the victim to compensate the victim for a property loss or pecuniary loss under this subsection.

Md.Code Ann. (1957, 1996 Repl.Vol., 2000 Supp.), Art. 27, § 807.

"Properly viewed, restitution is beneficial to both the child and to his victim," and it serves the rehabilitative purpose of the juvenile statute. *In re Herbert B.*, 303 Md. 419, 428, 494 A.2d 680 (1985). As the Court of Appeals stated in *In re Herbert B.*:

[R]estitution is rehabilitative in several important respects. For example, restitution impresses upon the child the gravity of harm he has inflicted upon another, and provides an opportunity for him to make amends. In addition, restitution makes the child accountable for his acts by leading him to realize the seriousness of such acts and to accept responsibility for them. Finally, an obvious purpose of restitution is that it compensates the victim for the child's delinquent act.

*Id.* at 427–28, 494 A.2d 680. Moreover, a court enjoys "broad discretion to order restitution." *In re Don Mc.*, 344 Md. 194, 201, 686 A.2d 269 (1996).

Appellants argue, however, that they do not have the ability to pay restitution. Ryan maintains that his learning disability prevents him from being able to obtain a job that pays more than minimum wage. Linda S. maintains that her expenses exceed her income, as she supports Ryan, and, at times, her adult daughter and her daughter's children.

When a court orders restitution, it must conduct " 'a reasoned inquiry into the defendant's ability to pay' " so as not to impose a restitution amount in excess of the defendant's ability to pay. *In re Don Mc.*, 344 Md. at 203, 686 A.2d 269 (quoting *Coles v. State*, 290 Md. 296, 306, 429 A.2d 1029 (1981)). In the case *sub judice*, the court considered Ryan's ability to pay and stated that

even if his ... apparent ability is only to earn minimum [w]age, and we know that he did have a[t] least one job where he was earning more than minimum wage, he has no deficits, no disabilities. He has no expenses, basically, to— to be capable of paying the restitution.

As for Linda S., the court stated that

[her] resources, although stretched thinner, would provide for [restitution] in terms of sharing it with Ryan.

The record supports the court's conclusions. No evidence was presented supporting Ryan's assertion that he was learning disabled nor was evidence adduced that his ability to obtain a job was impaired in any other way. In fact, as the court noted, Ryan had held at least one job earning more than minimum wage. Moreover, as the court observed, although Ryan lives with his mother, he does not contribute to the payment of household expenses.

As for Linda S., the court pointed out that she has resources to pay the restitution, although those resources are, at times, stretched "thinner" because of her support of Ryan, her adult daughter, and her grandchildren. The court conducted a "reasoned inquiry" into both Ryan's and Linda S.'s ability to pay and determined that together they had the ability to pay the restitution amount. The court did not err in ordering restitution or in assessing the statutory maximum, a fraction of the amount of Dent's total medical expenses of approximately $300,000.00.

 Appellants next argue that restitution is inappropriate where there are "extenuating circumstances," and claim that Dent's "violent and abusive" nature is such a circumstance. *See* Art. 27, § 807(a)(4)(ii)(providing that "[a] court need not issue a judgment of restitution" if the court finds extenuating circumstances rendering a restitution award inappropriate). They maintain that his violence "was, at least, partly responsible for the results."

The court considered appellants' "extenuating circumstances" argument and determined that "where this got wildly

out of hand was in the fact of Ryan producing—not just a knife, but a big, serious knife, and the events that ... led on from there." The court pointed out that, although Ryan may not have meant to stab Dent, the "lack of intent was what reduced the charge" from first degree assault to second degree assault. The court thereafter determined that restitution was proper because Ryan "put into motion and propelled the instrumentality that was the ultimate cause of that which brought harm to Dent." We find no "extenuating circumstances" that would have rendered the restitution ordered by the court inappropriate.

▮▮▮ Finally, appellants argue that the restitution statute does not "provide for blanket restitution to all insurers." They do not dispute that Dent's medical expenses fall within the type of expenses covered by the restitution statute; rather, they contend that the statute only provides for restitution to the insurer for payments made directly to the victim, not for payments made to medical providers on the victim's behalf. In support of that claim, appellants rely on Article 27, § 807(a)(5)(iii), which provides that restitution may be ordered to reimburse "[a] third-party payor, including an insurer, which has made payment to the victim to compensate the victim for a property loss or pecuniary loss under this subsection." Because Kaiser Permanente paid Dent's medical bills instead of reimbursing him for paying those bills, appellants contend that it is not entitled to restitution. We disagree.

▮▮▮▮ "The cardinal rule of statutory construction is to effectuate and carry out legislative intent." *Rose v. Fox Pool Corp.*, 335 Md. 351, 358, 643 A.2d 906 (1994). Because every statute furthers some underlying purpose, we must construe a statute according to its general purposes and policies. *Id.* at 358–59, 643 A.2d 906. In engaging in statutory interpretation, we look first to the words of the statute, giving them their "natural and ordinary signification, bearing in mind the statutory aim and objective." *Richmond v. State*, 326 Md. 257, 262, 604 A.2d 483 (1992). "If the words of the statute, construed according to their common and everyday meaning, are clear

and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Jones v. State,* 336 Md. 255, 261, 647 A.2d 1204 (1994). Whether or not a statute is clear, however, "we are not 'precluded from consulting legislative history as part of the process of determining the legislative purpose or goal' of the law." *Morris v. Prince George's County,* 319 Md. 597, 604, 573 A.2d 1346 (1990) (quoting *Wilde v. Swanson,* 314 Md. 80, 92, 548 A.2d 837 (1988)). That legislative history is an " 'external manifestation[ ]' or 'persuasive evidence' of legislative purpose that may be taken into consideration." *Rose,* 335 Md. at 360, 643 A.2d 906.

In 1982, the Maryland General Assembly amended Article 27, § 640, the criminal restitution statute, to cover third-party payors. 1982 Md. Laws, ch. 477. At that time, the criminal restitution statute and juvenile restitution statute were separate provisions. In 1997, however, the two provisions were combined into one—Article 27, § 807—the current restitution statute.

The addition of the third-party payor provisions was in response to the Court of Appeals' decision in *Montgomery v. State,* 292 Md. 155, 438 A.2d 490 (1981). In *Montgomery,* the Court of Appeals held that § 640 did not permit court-ordered restitution for private insurance companies. *Id.* at 163, 438 A.2d 490. In that case, the defendant "plead guilty to one count of storehouse breaking" and was ordered to pay restitution to the owner of the storehouse and its insurer. *Id.* at 157, 438 A.2d 490. After reviewing the legislative history of § 640, the Court stated that "[i]n the absence of an express definition of the term 'victim,' and in the absence of any expression of legislative intent to broaden the definition of the term 'owner,' or its contextual synonym, 'party injured,' we can only conclude that the term 'victim,' in the statute applicable here, is limited exclusively to the owner of the property taken or damaged and does not include third party payors, such as private insurance companies." *Id.* at 161, 438 A.2d 490.

The Court then compared the absence of a provision providing for restitution to a private insurance company with the

inclusion of a provision providing for restitution to a government entity that paid medical expenses on behalf of the victim. *Id.* at 161–62, 438 A.2d 490. By "limit[ing] restitution to third party payors for payment of medical expenses incurred as a result of personal injury," the Court reasoned, the Legislature specifically intended not to include "restitution to third party payors for payments made where property was taken or damaged." *Id.* at 162, 438 A.2d 490. The Court opined that the General Assembly could have provided for restitution to private insurance companies but specifically chose not to when it limited, in the context of restitution for medical expenses, "the class of third party payors to which restitution could be made ... to governmental entities and did not include other classes of third party payors, such as private insurance companies." *Id.*

In response to that decision, the Legislature amended § 640 to provide expressly for restitution to private insurance companies. That amendment provided, *inter alia,* that:

(2) The Court may order that restitution be made to:

\* \* \*

(iii) A third-party payor, including an insurer, which has made payment to the victim to compensate the victim for a property loss under paragraph (1)(I) of this subsection, or pecuniary loss under paragraph (1)(II) of this subsection.[1]

The purpose of that amendment was, in part, to change "current law," which "[did] not include insurance companies who have paid the claim of the victim."[2] Thus, the Legislature clearly intended that the amendment would alter the law to permit court-ordered restitution to insurance companies

---

1. Subsequently, this subsection was amended and re-numbered as § 807(a)(5)(iii). That amendment only affected its form, not its substance.

2. This statement appeared in a memorandum prepared by the principle sponsor of the amendment, State Senator Walter Baker, explaining the reasons for that amendment.

that had paid the expenses of a policyholder who had been the victim of a crime.

To draw a distinction, as appellants would have us do, between an insurance company that has paid the victim directly and an insurance company that has paid the victim's bills would thwart the Legislature's intent to extend the right to receive restitution to third-party payors, such as insurance companies. Furthermore, because most, if not all, policyholders permit medical providers to collect payments for services rendered on their behalf, instead of paying out-of-pocket and submitting claims themselves for reimbursement, such a distinction would rarely provide restitution to insurers, thereby rendering § 807(a)(5)(iii) a nullity. We decline to read that statute so narrowly as to circumscribe the legislative intent and to carve out an unintended exception.

We therefore find that the court's restitution order complies with § 807(a)(5)(iii) and the legislative purpose of the restitution statute. Accordingly, the juvenile court did not err or abuse its discretion in ordering appellants to pay restitution to Kaiser Permanente in the amount determined by that court.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**