797 A.2d 39

**In re RYAN S.**

**No. 85, Sept. Term, 2001.**

Court of Appeals of Maryland.

April 22, 2002.

28

Bradford C. Peabody, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued Before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

BATTAGLIA, Judge.

The questions with which we are presented in this case involve, once again, the juvenile court practice that existed in Montgomery County when the juvenile court was part of the District Court, whereby adjudicatory hearings were commenced within the requisite time period pursuant to Rule 11–114 but were continued on non-consecutive trial dates over a period of months. Today, we must determine whether the Court of Special Appeals erred in holding that the petitioner, Ryan S., waived his right to challenge the untimeliness of his adjudication; if error is found, we shall also consider whether the petitioner's motion for dismissal, or in the alternative, mistrial, should have been granted by the juvenile court due to violations of Rule 11–114b. Finally, we must determine whether the Court of Special Appeals erred in affirming the juvenile court's order that Ryan and his mother, Linda S., pay restitution to the victim's insurer, Kaiser Permanente, in the amount of $10,000.00.

## I. Statement of Facts

This case arises from an altercation between the petitioner, Ryan S., and the victim, Ronnie Dent, at the petitioner's home in Rockville, Maryland, on February 4, 1998. Dent, a 48–year–old man and cousin of Ryan's natural father, began a sexual relationship with Ryan's mother, Linda S., shortly after the death of Ryan's father. This relationship greatly upset Ryan, who was seventeen at the time of the altercation, and Ryan expressed his disapproval of the relationship to both Dent and his mother on several occasions. According to Dent, Ryan threatened to kill Dent a couple of times prior to their physical altercation.

The facts concerning the evening of February 4, 1998 were disputed. Both parties' versions agree, however, that at some point during the evening, Dent and Ryan began arguing.

Dent claimed that when he arrived at the home of Ryan and Linda S. on the evening of February 4, 1998, Ryan began yelling at Dent, exclaiming that he did not want Dent "coming around here, seeing my Mom." Dent testified that Ryan immediately grabbed a knife and moved toward Dent. To protect himself, Dent grabbed a vacuum cleaner and raised it to his shoulder. When Linda S. jumped in between them, Dent turned to put the vacuum cleaner down. As he was doing so, Ryan stabbed Dent in the back.

Ryan alleged that when he and Dent were arguing, Dent threatened to "crush him." Ryan further testified that Dent threw him to the ground and appeared to be reaching for something in his pocket. To protect himself, Ryan got up and ran to the kitchen to grab a knife. Dent then came after Ryan and again threw him into the ground, falling on top of him. The two struggled violently on the floor until, at some point, Dent exclaimed that he had been stuck with the knife. Ryan claimed that this was unintentional, that Dent "probably fell on it [the knife]."

Dent sustained serious injuries and was hospitalized as a result of the altercation.

## II. Procedural History

Ryan turned himself into the police on May 11, 1998, and three days later, on May 14, 1998, he appeared before the District Court of Maryland, Montgomery County, sitting as a juvenile court.[1] The District Court ordered that Ryan be detained at the Alfred D. Noyes Children's Center ("Noyes") pending a "reverse waiver" hearing to determine whether his case would be heard in a juvenile or "adult" court.

On June 5, 1998, the petitioner was indicted in the Circuit Court for Montgomery County for first degree assault and carrying a weapon openly with intent to injure. On June 10, 1998, the petitioner filed a motion to transfer his charges to juvenile court pursuant to Article 27, Section 594A.[2] The Circuit Court for Montgomery County held the "reverse waiver" hearing on August 10, 1998, and on August 14, 1998, ultimately granted the motion and ordered that the charges be transferred to juvenile court.

The State filed a petition in the District Court of Maryland, Montgomery County, sitting as a juvenile court on August 20, 1998, charging Ryan with delinquency based on first degree assault, reckless endangerment, and carrying a weapon openly with intent to injure. The State also sought the statutory maximum amount of restitution, $10,000.00, from Ryan and his mother for Dent's medical expenses.[3]

---

**1.** As of March 1, 2002, the Circuit Court for Montgomery County had jurisdiction over juvenile causes. *See* 2001 Md. Laws 414.

**2.** Maryland Code (1957, 1996 Repl.Vol.), Art. 27, Section 594A(a) provided:

(a) *Transfer to juvenile court.*—In any case, except as provided in subsection (b), involving a child who has reached 14 years of age but has not reached 18 years of age at the time of any alleged offense excluded under the provisions of § 3–804(e)(1) or (4) of the Courts and Judicial Proceedings Article, the court exercising jurisdiction may transfer the case to the juvenile court if a waiver is believed to be in the interest of the child or society.

This portion of the Maryland Code was repealed by the Acts of 2001, ch. 10, § 1 (effective October 1, 2001), and is now located at Section 4–202 of the Criminal Procedure Article.

**3.** Maryland Code (1957, 1996 Repl.Vol., 1999 Cum.Supp.) Article 27, Section 807(a)(3)(ii) provided, in relevant part:

Ryan's adjudicatory hearing began on September 10 and continued on September 11, 1998. Pre-trial motions were heard and three of the State's witnesses testified.[4] The adjudicatory hearing, however, was far from complete; the juvenile court scheduled the hearing to resume on December 13, 1998. Ryan contested both his continuing detention at Noyes[5] and the duration of the delay between the hearings. The court refused to release Ryan and refused to move the adjudicatory hearing to an earlier date. As a result, Ryan filed a petition for a writ of habeas corpus in the Circuit Court for Montgomery County. At the habeas corpus hearing, the Circuit Court, without formally ruling, verbally directed that Ryan be released from Noyes and that the juvenile court re-schedule the date of the hearing for within thirty days of September 10, 1998.[6] The juvenile court refused to honor the Circuit Court's instruction regarding scheduling, but ultimately did release Ryan from Noyes. Upon Ryan's release, the Circuit Court determined that the petition for writ of habeas corpus was moot and the petition was withdrawn.

The adjudicatory hearing resumed on December 14 and 15, 1998.[7] When it became apparent, again, that the trial would

As an absolute limit against one child, the child's parent, or both, a judgment of restitution issued under this section may not exceed $10,000 for all acts arising out of a single incident.

This portion of the Maryland Code was repealed by the Acts of 2001, ch. 10, § 1 (effective October 1, 2001), and is now located at Section 11–604(b) of the Criminal Procedure Article.

4.  The emergency room physician, the police officer who first arrived at the scene, and the victim, Dent, testified during the September adjudicatory hearings.

5.  As of September 11, 1998, Ryan had been detained for nearly four months at Noyes.

6.  The propriety of the Circuit Court's verbal directive at the habeas corpus hearing is not before us in this case.

7.  On the 14th of December, the first day the hearings resumed, Ryan moved for a mistrial for violation of Rule 16–504 which requires the court to report verbatim all trials and hearings. Portions of the copies of the September 10th and 11th adjudicatory hearings were inaudible

not be completed during these scheduled dates, the court and counsel discussed scheduling issues again. The hearing was continued to January 13, 1999, and Ryan made no objection.

On the 13th of January, Ryan moved for a mistrial alleging that he had been denied his right to a fair trial due to the lengthy and disjointed nature of his adjudicatory hearing and because the recordings of the prior hearings were unintelligible, which he alleged was a violation of Rule 16 504.[8] The motion for mistrial was denied, and the juvenile court resumed and completed the petitioner's adjudicatory hearing. The court found the petitioner not involved in first degree assault, but involved in second degree assault, reckless endangerment, and carrying a weapon openly with intent to injure.

To the extent necessary, a more detailed description of the procedural history and the pertinent portions of the transcripts of this case will be provided when discussing the issues presented below.

### III. Discussion

### A. Waiver

The Court of Special Appeals held that while the petitioner's complaint concerning the "protracted and disjointed nature of the proceedings in this case" was valid, the complaint, itself,

---

which, Ryan argued, caused tremendous hardship in his preparation for the resumed hearings, particularly with respect to the testimony of Dent. The court, after listening to the master copy of the tapes, found the quality to range from "almost lifelike clarity to being somewhat fuzzy, particularly during parts of cross examination [of Dent] conducted by [defense counsel]." Therefore, the court denied the motion for mistrial but permitted Ryan the opportunity to review the master copy of Dent's testimony prior to resumption of his testimony.

8. The record indicates that Ryan actually renewed his earlier motion for mistrial from the December 14, 1998 hearing, *see supra* note 7. The petitioner expanded upon arguments proffered at the December hearing, alleging that the disjointed nature of the trial was grounds, itself, for a mistrial, but also that the nature of the trial made the recordings of the trial even more critical for adequate preparation and representation in a fair trial. The audio recordings of the hearings failed to capture significant portions of the petitioner's cross-examination of the witnesses.

**34**

was waived. *See In Re Ryan S.,* 139 Md.App. 94, 111, 774 A.2d 1193, 1202 (2001). The intermediate appellate court asserted that the petitioner did not make a timely objection to the court's continuances and further claimed that any objection the petitioner did make was based on a violation of Rule 11–114b.2 and not Rule 11–114b.1, which was the basis upon which the motion for dismissal was argued.[9] *Id.* at 111–12, 774 A.2d at 1202–03. We disagree with the Court of Special Appeals. The conclusion that the petitioner waived his right to appellate review of the timeliness and continuity of his trial is erroneous.

Contrary to that which the Court of Special Appeals alludes is necessary to preserve an issue for appellate review, a party need not, in every circumstance, recite a specific litany to constitute an objection to a trial ruling or course of action. Maryland Rule 4–323(c), applicable to criminal cases, provides in relevant part:

> For purposes of review by the trial court or on appeal of any other ruling or order, it is sufficient that a party, at the time the ruling or order is made or sought, makes known to

---

9. Maryland Rule 11–114 provides for the scheduling of adjudicatory hearings, in relevant part, as follows:
   b. Scheduling of hearing.
   1. Adjudicatory hearing. An adjudicatory hearing shall be held within sixty days after the juvenile petition is served on the respondent unless a waiver petition is filed, in which case an adjudicatory hearing shall be held within thirty days after the court's decision to retain jurisdiction at the conclusion of the waiver hearing. However, upon motion made on the record within these time limits by the petitioner or the respondent, the administrative judge of the county or a judge designated by him, for extraordinary cause shown, may extend the time within which the adjudicatory hearing may be held. The judge shall state on the record the cause which requires an extension and specify the number of days of the extension.
   2. Prehearing detention or shelter care. If the respondent is in detention or shelter care, the adjudicatory hearing shall be held within thirty days from the date on which the court ordered continued detention or shelter care. If an adjudicatory hearing is not held within thirty days, the respondent shall be released on the conditions imposed by the court pending an adjudicatory hearing, which hearing shall be held within the time limits set forth in subsection 1 of this section.

the court the action that the party desires the court to take or the objection to the action of the court.

As we stated in *Lattisaw v. State,* 329 Md. 339, 619 A.2d 548 (1993), where defense counsel failed to make a specific motion but *indicated his disagreement* with the court's view on whether the reluctance of a juror (as demonstrated by polling) should be a factor in considering whether the verdict was defective, a party need only make known his "objection to the action of the court." *Id.* at 344, 619 A.2d at 550. *See also Caviness v. State,* 244 Md. 575, 578, 224 A.2d 417, 418 (1966)(stating that "unless a defendant makes timely objections in the lower court *or makes his feelings known to that court,* he will be considered to have waived them and he can not now raise such objections on appeal")(emphasis added).

Similarly, Maryland Rule 2–517(c), applicable to civil cases provides, in relevant part,

For purposes of review by the trial court or on appeal of any other ruling or order, it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court.

In *Mayor & City Council of Baltimore v. Theiss,* 354 Md. 234, 729 A.2d 965 (1999), we discussed the historical development of Rule 2–517 and, quoting from a predecessor rule, Rule 17, noted that "[f]ormal exceptions to the rulings or orders of the court are unnecessary; ... it is sufficient that a party at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take...." *Id.* at 245, 729 A.2d at 971 (quoting Court of Appeals Rule 17 (1945)); *accord Univ. of Maryland Med. Sys. Corp. v. Malory,* 143 Md.App. 327, 351, 795 A.2d 107, 121 (2001), *cert. denied* 364 Md. 141, 771 A.2d 1070 (2001).

Thus, as long as the party, whether in a civil or criminal case, clearly makes the judge aware of the course of action he or she desires the court to take and the reasons for such course of action, the party shall have adequately preserved that issue for appellate review. *See Everhart v. State,*

274 Md. 459, 472, 337 A.2d 100, 107 (1975); *Fowler v. Benton*, 229 Md. 571, 575, 185 A.2d 344, 347 (1962), *cert. denied* 375 U.S. 845, 84 S.Ct. 98, 11 L.Ed.2d 72 (1963). While the juvenile rules are silent on this matter, the standard for determining preservation in criminal and other civil cases holds true in juvenile cases as well.

In the case at hand, the petitioner, without question, alerted the court to his concerns about the lack of continuity and the duration of the delays between the hearings. When the adjudicatory hearing was initially scheduled, the petitioner expressed concern over the fact that the judge only allowed for a half-day, but the court assured the petitioner that it would "move cases" if necessary to accommodate the hearing.[10]

After the pre-trial motions were argued and testimony from three State witnesses taken on September 10 and September 11, 1998, it became apparent that the adjudicatory hearing would not be completed. The court informed the parties that the adjudicatory hearing would be continued to December 14, 1998. Given the length of the delay, counsel for the petitioner requested that the court release the petitioner from Noyes. The court denied the motion based on the seriousness of the injury inflicted upon Dent and the petitioner's three-month delay in turning himself into the authorities.

Immediately after the judge denied the motion to release the petitioner from custody, the petitioner's counsel protested

---

**10.** The colloquy between the defense counsel and the court regarding the setting of the adjudication date was as follows:

[The Court] ... So, he'll be detained at Noyes, we'll set a half day hearing, adjudication hearing in thirty days. And we should have a pre-trial before it. That way, we'll get together and really assess how many witnesses and so forth. Yes?

[Defense Counsel] I was going to say, just from talking to my colleagues about the way that this works, I mean, I'm pretty sure that this is going to be an adjudication ...

[The Court] *I'm going to move cases if I have to.* I'm setting it for a half day.

(emphasis added).

the amount of time between the hearings. The ensuing colloquy was, in relevant part, as follows:

> [Defense Counsel] Judge, now that you've made your ruling about his detention, I *guess I would like to revisit the issue of when we're going to hear this case.* I mean, my understanding of the statute is that, *he's entitled to have an adjudication hearing within thirty days.* He, we're available Monday. But I mean, I think that he's either entitled to be released, or . . . entitled to have his hearing completed within thirty days, so that he can have a determination about whether he's involved or not involved.

> [Court] Well if that, I mean, if that were the case [defense counsel], then any time that a case went, went into a second day, if it was the thirty-first day, he would, he would be entitled to be released and the case couldn't be concluded. And what if it was a case that would take a month to try? . . .

> [Defense Counsel] That's not the situation that we have in this case.

> [Court] I know that it's not, but it could lead, it could lead to that point. I'm very distressed that this case can't be heard sooner, I wish that it could, *it's difficult for me, as the trier of fact.* But, unfortunately . . . we have been given statutory authority to handle termination of parental rights cases, which are long, drawn out, protracted proceedings that all of our calendars are getting filled up with those kinds of cases.

(emphasis added).

Thus, the petitioner's counsel expressed concern for *both* the length of delay between the hearings and the fact that the petitioner would be in detention at Noyes for three more months. The juvenile court then suggested that the petitioner file a motion to advance the trial date because rescheduling "would have to be a matter that would be addressed to . . . the [judge in charge]. Because if my calendar's going to be reshuffled to put this case in earlier, that would have to come

. . . from [the judge in charge]." Petitioner's counsel, again, stated that the requirements of Rule 11–114 were being violated:

> [Defense Counsel] And Your Honor, I *would just like to say that I, looking at [Rule] 11–114, my reading of this rule says that the hearing shall be held within thirty days. And if it is not to be held within thirty days . . . [t]hen the Respondent shall be released. We are not waiving.*

\* \* \*

> [Defense Counsel] My . . . [b]elief is that the Court of Appeals would say that if the trial was beginning, just like a one hundred and eighty day ruling, if the trial begins and continues on the hundred and eighty first and hundred eighty second day, you've complied with the rule. If the Court were confronted where the trial begins on the thirtieth day, and continues [un]til the ninetieth day, I would say that the Court of Appeals would say that that is not complying. *And I'm just asking Your Honor to follow the rule* and either continue this trial . . . on Monday, or release him today.
>
> [Court] Okay, I feel that the rule has been complied with. If you wish to file a motion to advance, because it would involve a re-shuffling of the, of the Court's calendar, that I don't feel that I have the authority to do, it should be addressed to [the judge in charge], and I'll certainly be happy to abide by his ruling.

(emphasis added).

In response to the juvenile court's ruling, and in lieu of its suggestion, the petitioner's counsel filed for a writ of habeas corpus. The petitioner's petition for writ of habeas corpus was directed not only to advancing the trial date, but also to securing the release of the petitioner from Noyes.[11] It is clear

---

11. The defense counsel explained, at the September 16, 1998 hearing before the judge in charge, why the habeas petition was filed:

that the petitioner's concerns about the delay between his hearings were presented in the context of the habeas corpus petition because the Circuit Court verbally instructed the juvenile court to *set a trial date within thirty days* of September 10th and release the petitioner from Noyes.

██ The judge in charge of the juvenile court refused, however, to accept the Circuit Court's verbal directive stemming from the habeas corpus petition:

> [State] Your Honor, we had a hearing [in response to a habeas corpus petition] just a few minutes ago in front of [the administrative judge of the Circuit Court for Montgomery County]. [He] ... *ordered that the Juvenile Court is to set a trial date within thirty days of September 10th* ...
>
> [Court] Tell me something. How does this Circuit Court order me to do that?
>
> [State] Your Honor, I was trying ...
>
> [Court] What jurisdiction do they have?
>
> [State] I was trying to select that word carefully but ...
>
> [Court] Because I don't think they do, and *I'm not going to comply with an order of the Circuit Court.*
>
> \* \* \*
>
> [Court] Let him [act on the habeas corpus]. Because frankly, he's not running my Court, I object to him trying to do so. I gave his Clerk, with you on the phone, reasons why we weren't able to set this within thirty days. Judge Weinstein should understand that this Court is the same level as the Circuit Court, unfortunately, it still has

---

[O]ur position is simply that Ryan['s] ... rights are to have ... an adjudication completed within thirty days ... And, if that requires Your Honor to move cases, then we believe that's what Ryan is entitled to. And if not, then there is a remedy under the rule. And it's not to say that the Court's docket has to be disrupted. There is a remedy under the rule, ... the rule says he needs to be released. We asked [the juvenile court judge] to do one or the other of those requirements in the rule, and he chose to do neither and that's where we are today and that's why we filed the habeas.

the name District Court. But, I am not going to do, I'm not going to let Judge Weinstein be the administrative Judge for this Court. He's not going to tell me when I'm going to set cases in.

[State] Okay.

[Court] I'm going to try to comply with the law ... I believe I have. And I will not permit the Circuit Court to order me to set a trial date. If he wants to release somebody on habeas corpus, it's on him.

(emphasis added). Notwithstanding the views of the judge in charge of the juvenile court, the petitioner clearly made his objection to the untimeliness of the adjudicatory hearings known to the court. That the petitioner failed to specifically cite subsection b.1 of Rule 11–114 is irrelevant. The petitioner chose to object to the juvenile court's ruling by filing a petition for habeas corpus relief and further voiced his objections at the hearings thereafter. At this juncture, it was within the power of the juvenile court to correct the error by advancing the trial date. As we have often stated, whether a court had the ability to correct an error is a significant factor in determining whether a party waived appellate review of his or her complaint. *See State v. Bell*, 334 Md. 178, 189, 638 A.2d 107, 113 (1994)(asserting that "[t]he interests of fairness are furthered by 'requiring counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings' ")(quoting *Clayman v. Prince George's County*, 266 Md. 409, 416, 292 A.2d 689, 693 (1972)); *Basoff v. State*, 208 Md. 643, 650, 119 A.2d 917, 921 (1956)(stating that a party's "failure to exercise the option [to object] while it is still within the power of the trial court to correct the error is regarded as a waiver of it estopping him from obtaining a review of the point or question on appeal").

After the juvenile court declared that it would not reconsider the scheduling of petitioner's adjudicatory hearing, we can find no fault in counsel's determination to concede to the court's ruling; in fact, he arguably had no choice but to yield to the court. *See In re Emileigh F.*, 353 Md. 30, 36–37, 724

A.2d 639, 642 (1999)(stating that when "it was apparent that [the court's] ruling on further objection would be unfavorable to the defense . . . .the absence of a further objection did not constitute a waiver")(quoting *Johnson v. State,* 325 Md. 511, 515, 601 A.2d 1093, 1094 (1992)). The Court of Special Appeals glossed over the basis for, and significance of, the petition for writ of habeas corpus by improperly qualifying the petitioner's motion as an objection "solely on the ground that he was being detained," when it is clear from the record that the length of the time between hearings was also a crucial element of his argument. *See In re Ryan S.,* 139 Md.App. at 111, 774 A.2d at 1203. Furthermore, the intermediate appellate court improperly emphasized the distinctions of subsections b.1 and b.2 of Rule 11–114 when it deemed the petitioner's objections to have only fallen under subsection b.2. *See id.* at 111–12, 774 A.2d at 1203. As the Court of Special Appeals, itself, stated in this very case, "[t]here is no logical reason to treat the thirty-day requirement of subsection b.1 any differently than the thirty-day requirement of subsection b.2." *Id.* at 109, 774 A.2d at 1201. The purpose of Rule 11–114 is not limited by its subsections; delays in juvenile adjudications, in general, subvert the overriding goal to "rehabilitate and treat delinquent juveniles so that they become useful and productive members of society." *In re Anthony R.,* 362 Md. 51, 68, 763 A.2d 136, 146 (2000)(quoting *In re Keith W.,* 310 Md. 99, 106, 527 A.2d 35, 38 (1987)); *see also* Md.Code, (1973, 1998 Repl.Vol., 2000 Supp.), § 3–802 of the Courts and Judicial Proceedings Article (outlining the purposes of the juvenile delinquency statute). Put simply, Rule 11–114 guarantees juveniles a timely adjudication, and should one fail to occur within the thirty days, a detained juvenile is to be released.[12]

---

12. The Court of Special Appeals and the dissenting opinion fail to appreciate that the *hallmark of both subsections is a timely adjudication.* That subsection b.2 also provides a remedy for detained juveniles should the courts fail to provide the requisite timely adjudication, does not mean that a detained juvenile who objects to the untimely nature of his/her proceedings must specifically articulate whether he or she is objecting under subsection b.1 or subsection b.2 in order to ensure that his or her right is preserved. So long as it is clear from the record, as

42

■ The petitioner's objections to the scheduling of the adjudicatory hearing were clear and apparent. Because he was detained at the time, both subsection b.1 and b.2 applied to the petitioner's circumstances; that he may have chosen to emphasize one subsection over the other in voicing his objection to the court does not mean that the petitioner waived his right to protest the other. So long as the objection to the scheduling of the adjudicatory hearing is clear, as it was in this case, a party cannot be said to have waived his or her ability to protest the timeliness of the court's scheduling under Rule 11–114.

## B. Adjudicatory Hearing Requirements Under Maryland Rule 11–114.

■ A juvenile court, under Rule 11–114b.1, is only permitted to extend the time within which it may hold an adjudicatory hearing for "extraordinary cause shown." In relevant part, Rule 11–114b.1 provides:

> However, upon motion made on the record within these time limits by the petitioner or the respondent, the administrative judge of the county or a judge designated by him, *for extraordinary cause shown*, may extend the time within which the adjudicatory hearing may be held. The judge shall state on the record the cause which requires an extension and specify the number of days of the extension.

(emphasis added). The scheduling of a hearing pursuant to subsection b.2 also has similar time restrictions; it expressly states that the adjudicatory hearing "shall be held within the time limits set forth in subsection 1 of this section." *See* Rule 11–114b.2. Thus, the extraordinary cause provision would be applicable also to hearings scheduled for juveniles, who at some point during the process, were detained. We discussed the criterion of "extraordinary cause" in *State v. Hicks*, 285 Md. 310, 403 A.2d 356 (1979), with respect to the scheduling requirements for criminal cases under Article 27, Section 591

---

it was in the case *sub judice,* that the juvenile objected to the delays, we shall consider his Rule 11–114 right to a timely adjudication preserved.

of the Maryland Code.[13]   We stated that while extraordinary cause is a fact-based determination made on a case by case basis, "[c]learly, . . . it is cause beyond what is ordinary, usual or commonplace; it exceeds the common order or rule and is not regular or of the customary kind." *Hicks,* 285 Md. at 319, 403 A.2d at 361.[14]   Extraordinary cause means for other than ordinary reasons.

The extraordinary cause standard in Rule 11–114 was chosen intentionally and with purpose.   The subcommittee on domestic and juvenile rules presented a report to the Rules Committee on the proposed changes to Rule 914b which highlights the basis for the stricter standard.   The subcommittee report stated:

> in the opinion of the subcommittee, the standard which would be set by a good cause provision would not be sufficient to preserve the strong public policy which calls for the relatively speedy hearing of juvenile matters.   Accord-

---

13.   Article 27, Section 591 was later amended and the "extraordinary cause" provision became "good cause."   *See* 1980 Md. Laws Ch. 378. This change occurred in part to "offer the courts some leeway in the disposition of an extremely heavy case load."   *See State v. Frazier,* 298 Md. 422, 460, 470 A.2d 1269, 1289 (1984)(quoting testimony before the House Judiciary Committee, February 12, 1980).   Thus, with respect to the newly amended "good cause" standard of Article 27, Section 591, we stated, "particularly in light of the testimony before the Committee, clearly indicated a legislative intent that crowded court dockets may constitute sufficient cause for trying a case beyond the 180–day deadline."   *Id.* at 461, 470 A.2d at 1289.

14.   We note that in *In re Keith,* 310 Md. 99, 527 A.2d 35 (1987), we refused to blindly apply the holding in *Hicks,* i.e. that under the provisions of Rule 746, dismissal was appropriate for the State's failure to comply with mandatory requirements of Rule 746, to juvenile proceedings under Rule 914 because of the particular needs of juveniles who encounter the justice system.   *Id.* at 107, 527 A.2d at 39.   That we disapproved of applying the *same sanction* for a violation of Rule 914 as for a violation of Rule 746 does not mean that *interpretations* of Rule 746 are *per se* inapplicable to juvenile proceedings under 914.   In fact we acknowledged that "Rule 914 and Rule 746 contain nearly identical language," but ultimately held that the identical language of the rules did not automatically warrant an identical sanction for violation.   *Id.* at 103, 527 A.2d at 37.

ingly, the subcommittee recommends that the Rule be amended to include an "extraordinary cause" provision.

The chairman of the subcommittee explained that the higher standard was based on the pervasive perception that juvenile cases *should* be handled in a more expeditious manner coupled with the *existing* tendency to relegate juvenile cases to positions of low priority. The subcommittee feared that a good cause standard might result in the granting of continuances as a matter of course; thus, additional safeguards (extraordinary cause) were necessary to ensure the swift disposition of juvenile cases.

Interestingly, the Rules Committee itself *initially* declined to accept the subcommittee's extraordinary cause standard, and instead selected a good cause standard with the caveat that the Rule would expressly state that certain matters do not constitute good cause. The proposed Rule stated, "[f]or the purposes of this rule, *the general congestion of the court's calendar* or failure to obtain available witnesses on the part of the petitioner *shall not constitute good cause.*" Maryland Rules Committee Notes, Domestic and Juvenile Subcommittee (October 16 and October 17, 1981). Ultimately, the Rule was adopted with an extraordinary cause standard, yet we find it significant that even under a good cause standard, the Committee was unwilling to allow court congestion to be the basis for an extension of the time limits for a juvenile's adjudicatory hearing as prescribed by the Rule.

▮ Without a more compelling reason, overcrowded dockets do not constitute, and never have constituted, "extraordinary cause." *See e.g. Frazier*, 298 Md. at 458, 470 A.2d at 1288 (stating that when "extraordinary cause," contrary to "good cause" was required for postponement of a criminal case, "it was arguable that, as a matter of law, overcrowded dockets did not constitute sufficient cause for a postponement"). Today, not only are we tasked to review the problematic practices of untimely or disjointed adjudicatory hearings as witnessed in this case, but we must address the apparent

adherence to this practice in the Montgomery County juvenile justice system.

Commencing hearings to technically beat the clock and then continuing those hearings to dates far beyond that which was envisioned by Rule 11–114 appears to have been a chronic problem in the Montgomery County juvenile court. The Court of Special Appeals pointedly cautioned the Montgomery County juvenile system to avoid this practice in *In re Vanessa C.*, 104 Md.App. 452, 656 A.2d 795 (1995). The intermediate appellate court, in that case, considered whether the provisions of Section 3–815 of the Courts and Judicial Proceedings Article and Rule 914, regarding the length that a child may be held in custody prior to a Child In Need of Assistance ("CINA") hearing, were mandatory or directory. *Id.* at 458, 656 A.2d at 798. The Court of Special Appeals interpreted the mandate that "an adjudicatory hearing .... [be] held within thirty days," to mean that the hearing did not need to be completed within thirty days, but rather, "that the hearing [shall] be initiated within thirty days and completed *with a reasonable degree of continuity*." *Id.* at 459, 656 A.2d at 798 (emphasis added). In explaining that which is contemplated by a reasonable degree of continuity, the Court of Special Appeals stated, "a hearing once begun must continue, insofar as possible, on a day to day basis until completed." *Id.* Particularly apropos to our discussion of the systemic problems in Montgomery County was the court's elucidation of the *purpose* for enunciating the inherent continuity requirements for adjudicatory hearings: "*The evil sought to be avoided is the present practice, at least in Montgomery County, of continuing cases ... for periods as long as thirty days, thereby prolonging the CINA determination for from three to five months in some cases.*" *Id.* (emphasis added). The practices within the juvenile justice system in Montgomery County were so as to warrant admonition by the Court of Special Appeals nearly seven years ago. It is disturbing, therefore, that the present case stands as yet another example that this disapproved practice persists.

It is incontrovertible that the juvenile court failed to comply with the requirements of Rule 11–114; more troubling, however, is that the record plainly manifests the court's low regard for the scheduling requirements of the Rule. We provide some excerpts from the case *sub judice* to demonstrate this point.

The sole basis for the court's postponements was overcrowded court dockets. On the several occasions where scheduling was discussed among the litigants and the juvenile court, delays were based on an apparent unwillingness to move other cases to accommodate the requirements of Rule 11–114. First, despite proffers by both parties that this case would take a considerable amount of time to adjudicate, (an assessment with which the court did not disagree on the record), the court originally set the case for a half-day hearing (although, an additional day was added subsequent to the hearing). At the hearing concerning the habeas corpus petition before the juvenile court on September 16, 1998, the State presented testimony that the adjudicatory hearing was scheduled for half-days on both the 10th and 11th of September despite the fact that "[a]ll of us, from fairly early on, felt that the case was going to take a significant amount of time." [15] The court assured the parties that it would move cases, if necessary, to accommodate the length of the hearing, but this pledge of flexibility never came to fruition.

Second, the court scheduled the resumption of the adjudicatory hearings three months after the initial hearing. Despite the petitioner's objection to his continuing detention and the length of time between hearings, the court refused to release the petitioner from Noyes and refused to move the adjudicatory hearing to an earlier date. The petitioner immediately filed for a writ of habeas corpus, pursuant to which, as mentioned earlier, the Circuit Court indicated that it would

---

15. We should not be understood to maintain that a judge necessarily must accept a party's assessment of how long that party requires to put on its case. In the present case, however, both parties agreed on the estimate for the length of the trial and the court did not dispute that estimate on the record.

decide in the petitioner's favor if the hearing were not re-scheduled and the petitioner released. The juvenile court, however, refused to re-schedule the adjudicatory hearing to an earlier date.

The court seemed unimpressed with respect to compliance with Rule 11–114 in conformance with the concerns as expressed *In re: Vanessa C., supra.* When discussing the additional days needed for trial, defense counsel asserted, and the State agreed, that at least two more days would be needed to complete the trial. The judge in charge of the juvenile court responded:

> "Just assume that I were in ... of a mind to start just clearing dockets, which is going to generate huge upheavals, among other people. But, just focusing for a time on this particular case. If I do that, ... we're already past the thirty days, so there's no way to rectify it.... *There's no point in my trying to do it.*"

(emphasis added). The judge in charge of the juvenile court continued,

> the truth is ... I don't have any more authority than anybody else ... [t]hey've just thrown this title at me, Judge in charge. So, I get to make those kind of calls. So, ... I'll accept the criticism for the Court, because I somehow got this job to try to manage things. What I'm saying is, even if I were to toss out a whole bunch of other cases and have you start again tomorrow, there's no ... *what's the point, because we've already missed the thirty days.*

(emphasis added). The State disagreed with the court's interpretation of the Rule and argued that the decision by the Court of Special Appeals in *In re Vanessa C.* supported the position that adjudicatory hearings should be completed within a reasonable time from commencement. *See In re Vanessa C.,* 104 Md.App. at 459, 656 A.2d at 798. At that point, the judge in charge of the juvenile court agreed to look at the court calendar again to see if the case could be accommodated. The court recessed briefly, but upon return, again rejected the

requests to move the adjudicatory hearing to an earlier date because the move would disrupt cases already scheduled:

> Admittedly, many cases involv[ed] individuals who were not being detained. But, [the judge in charge] made the decision, which I certainly totally endorse, that it would just be too, too completely disruptive to the cases that are already calendared to the individuals, the attorneys who have already worked their calendars around those dates, to start shuffling dates in accommodation to this case.

■ To deny the petitioner his right to timely and continuous adjudication under Rule 11–114 on the basis of avoiding the generic disruption of the court calendar is unacceptable.[16] Avoiding the "disruption" of a court calendar, absent some evidence of a specific explanation of the weighing of the competing cases by the court in its triage, cannot take precedence over the rights guaranteed by our statutes or rules of Court to juveniles subject to the justice system. The juvenile court failed to honor this hierarchy of rights and seemingly placed the rigidity of its docket ahead of the rights of an accused delinquent. Contrary to assertions by the dissent, there is no evidence on the record that reflects that honoring the petitioner's right to a timely adjudication would have prevented the court from honoring another juvenile's right to a timely adjudication, save the mere assertion by the juvenile judge that the court had several termination of parental rights cases on its docket. Again, a specific explanation of the exigencies of the competing cases in the court's triage is necessary before we will accept a crowded court docket as a basis for denying a juvenile his right to a timely adjudication.

Several adverse consequences result from the apparently systemic violations which were specifically witnessed in this case. The petitioner and other juveniles in his position have a

---

16. Not every postponement, even because of scheduling problems, necessarily constitutes a violation of Rule 11–114. "Extraordinary circumstances" is the test. We hold merely that a deliberate policy of fragmenting a case through the device of long and repeated postponements over objection for no reason specific to the case itself will suffice to constitute a violation.

right to have timely and continuous adjudication so that a determination can be made, as quickly as possible, as to whether the juvenile is involved or not involved in the alleged delinquent act. This right is of the highest priority because of the explicit guarantee in Rule 11–114, and in order to ensure that juveniles are given the benefit of all the rehabilitation and treatment options available. *See In re Anthony R.*, 362 Md. at 68, 763 A.2d at 146 (stating that "the overriding goal of Maryland's juvenile statutory scheme is to rehabilitate and treat delinquent juveniles so that they become useful and productive members of society")(quoting *In re Keith W.*, 310 Md. at 106, 527 A.2d at 38).

In fact, it is because of the Legislature's particular interests in rehabilitating juveniles to ensure that they become productive members of society that this Court previously has held that mandatory dismissal is an inappropriate sanction for *all* Rule 11–114 violations. *See In re Keith*, 310 Md. at 107, 527 A.2d at 39 ("We decline to undermine the legislature's efforts by hastily applying a rule to juvenile cases that was formulated to address problems inherent in the adult criminal system. Accordingly, we conclude that the *Hicks* solution is an inappropriate answer to violations of Rule 914.") We noted in *In re Keith*, that contrary to Rule 746 (the rule at issue in *State v. Hicks*, 285 Md. 310, 403 A.2d 356 (1979)), Rule 914 (now Rule 11–114) was not enacted to fortify the requirements of a mandatory statute enacted by the Legislature. *Id.* at 105–06, 527 A.2d at 38. Rule 746 was largely enacted as a result of our summary approval of the Court of Special Appeals's decision in *Young v. State*, 15 Md.App. 707, 708, 292 A.2d 137, 138, *aff'd mem.*, 266 Md. 438, 294 A.2d 467 (1972), *overruled by State v. Hicks*, 285 Md. 310, 334, 403 A.2d 356, 369 (1979), which held that the time limitations set forth in Article 27, Section 591 of the Maryland Code (establishing the 180 day rule for commencement of criminal trials) [17] were merely

---

17. Article 27, Section 591 provides:

(a) *Setting the date.*—The date for trial of a criminal matter in a circuit court:

directory, not mandatory. Thus, based on the seemingly purposeful enactment of Rule 746 in response to the *Young* decision, we determined that mandatory dismissal for Rule 746 violations was both the intended and required solution.

Again, because the Legislature had different goals and purposes behind enactment of the Juvenile Causes Act, *see* § 3–802(a) of the Courts and Judicial Proceedings Article, we determined that mandatory dismissal of juvenile petitions was not the required solution. That we declared *mandatory* dismissal to be inappropriate, however, does not mean that dismissal, itself, is inappropriate in all circumstances. In fact, in *In re Keith,* we stated that:

> [I]n determining whether dismissal is an appropriate sanction for a violation of Rule 914 [now Rule 11–114], *a judge presiding over a juvenile cause should examine the totality of the circumstances* as required by Rule 1–201. In doing so, the judge must keep in mind the overriding purpose of the juvenile statute along with the fact that this purpose will ordinarily not be served by dismissal of the juvenile proceeding. Neither the juvenile nor society should be denied the benefits of the juvenile's rehabilitation because of a technical violation of Rule 914's scheduling requirements. Nevertheless, *we do not foreclose the possibility that under some circumstances dismissal will be a proper sanction.*

310 Md. at 109–110, 527 A.2d at 40 (emphasis added). The juvenile court in the case *sub judice* failed to consider the totality of the circumstances in rendering its decision on the

---

(1) Shall be set within 30 days after the earlier of:
(i) The appearance of counsel; or
(ii) The first appearance of the defendant before the circuit court, as provided in the Maryland Rules; and
(2) May not be later than 180 days after the earlier of those events.
(b) *Changing the date.*—On motion of a party or on the court's initiative and for good cause shown, a county administrative judge or a designee of that judge may grant a change of the circuit court trial date.
(c) *Court rules.*—The Court of Appeals may adopt additional rules of practice and procedure for the implementation of this section in circuit courts.

motion to dismiss; it simply concluded that the structure of the juvenile system in Montgomery County did not permit a "willy nilly" moving of cases previously scheduled. Subsequently, when the motion to dismiss was renewed on January 21, 1999, the court did consider, more fully, the prejudice that allegedly befell the petitioner as a result of the delays between hearings but ultimately determined that the prejudice was not great and that extraordinary cause for the rescheduling existed because "the Court's calendar simply could not possibly accommodate [the petitioner's case]."

■ Upon considering the totality of the circumstances in this case, we believe that dismissal is the appropriate sanction for the Rule 11–114 violation. First, Rule 11–114 was clearly violated; while the hearings were commenced within thirty days, the courts failed to complete the hearings *with a reasonable degree of continuity*—a three month postponement of the hearing in this case is hardly a reasonable interruption in the adjudicatory process. Second, as we discussed, *supra,* no extraordinary cause was established for the delay.

Third, the lack of continuity and the length of the delay inherently and actually prejudiced the petitioner. The combined detention, both actual and home electronic monitoring, of the juvenile from the time he turned himself in to the final adjudication was eight months. Home electronic monitoring, while not deemed "detention" in the institutional sense, remains a significant restriction on the liberty of a juvenile, as employment, school attendance and other freedom of movement may still be denied the restrictee. Restrictions on the liberty of a juvenile are particularly troublesome when rehabilitative programs are not afforded the juvenile during detention or home restriction.[18] The goal of providing swift adjudi-

---

18. In September, when the petitioner's counsel requested to resume the hearings sooner than December, counsel noted that the petitioner had learning disabilities and attention deficit, hyperactive disorder, and that while Noyes agreed to provide the petitioner with GED books, it would not allow him into the GED program. Thus, the petitioner was "not being provided any services ... [and was] putting his life on hold because of a Court's calendar."

cations to juveniles exists, in part, to ensure that the State quickly determines the type of rehabilitative assistance most suitable for the offending juvenile. *See* Md.Code, § 3-802(a)(4) of the Courts and Judicial Proceedings Article.

In addition to the personal prejudices, the petitioner's adjudicatory hearing was adversely affected in several ways as a result of the delays. A defense witness died during the interval between the hearings. The State argues that this cannot be prejudice because a statement of the deceased witness was stipulated and entered into evidence.[19] Because there was no other admissible basis for the statement without the actual presence of the witness, this stipulation only occurred in the context of discussing prejudice when the petitioner renewed his motion to dismiss at the hearing scheduled for the rendition of the verdict; all evidence had been admitted and closing arguments heard at this point. Therefore, the fact remains that the petitioner's case was void of this witness's testimony. While the death of a witness cannot, itself, be grounds for a mistrial or a dismissal, it is evidence of prejudice and should be considered by the court.

Furthermore, the lack of continuity in the petitioner's adjudicatory proceedings inherently prejudiced his ability to obtain a fair adjudication in that the finder of fact was forced to pass judgment based on facts established in evidence from half-day hearings held four months before. Despite the juvenile court's assurances that it kept scrupulous notes and reviewed some portions of the recordings prior to judgment, and notwithstanding our confidence in a court's ability to recall such evidence, we are unpersuaded that the ills of an inherently disjointed process entirely were remedied thereby.

While courts should be hesitant to dismiss juvenile cases for violations of Rule 11-114 and other applicable juvenile provisions, we find the circumstances of the present case to be a "most extraordinary and egregious circumstance[ ] . . . [which]

---

19. The statement was written by the witness prior to his death and given to the police.

dictate[s] dismissal as the sanction for this violation. . . ." *In re Keith W.,* 310 Md. at 109, 527 A.2d at 40. Therefore, we hold that dismissal of the petitioner's case is an appropriate remedy for the flagrant violations of Rule 11–114 by the Montgomery County juvenile court.

## C. Restitution

■ The juvenile court ordered the petitioner and his mother to pay $10,000.00 in restitution to Kaiser Permanente for the company's payment of the victim's medical bills pursuant to Section 3–829 of the Courts and Judicial Proceedings Article.[20] *See* Md.Code. (1973, 1998 Repl. Vol), § 3–829 of the Courts and Judicial Proceedings Article ("The court may enter a judgment of restitution against the parent of a child, the child, or both as provided under Article 27, § 807 of the Code."). The petitioner argues that (1) they do not have the ability to pay the judgment; (2) restitution is inappropriate in this case because of extenuating circumstances; and (3) an insurer may be awarded restitution only when it directly compensates the victim, which did not occur in this case. Because we hold that the statute does not permit a court to award an insurer restitution when that insurer did not directly compensate the victim, we have no reason to address the other portions of petitioner's argument.

■ Article 27, § 807 provides, in part:

§ 807. Restitution for crimes.

(a) *Restitution upon conviction, acceptance of plea of nolo contendere, etc.; priority of payment; reasons for not ordering restitution.*—(1) A court may issue a judgment of restitution directing a defendant to make restitution in

---

**20.** The State argued that Linda S. is not a party to this appeal because she had separate counsel for the appeal to the Court of Special Appeals, but before this Court she is being represented jointly with her son by the Office of the Public Defender. We disagree with the State's presumption. The petition for writ of certiorari was submitted on her behalf, as well as the petitioner's. The Office of the Public Defender elected to represent both parties on appeal and Linda S. has not indicated that its representation of her is unauthorized.

addition to any other penalty for the commission of a crime, if:

\* \* \*

(ii) The victim suffered actual medical, dental, hospital, counseling, funeral, burial expenses, any other direct out-of-pocket losses, or loss of earnings as a direct result of the crime;

\* \* \*

(4) A court need not issue a judgment of restitution under this section if the court finds:

(i) That the defendant or liable parent does not have the ability to pay the judgment of restitution; or

(ii) Good cause to establish extenuating circumstances as to why a judgment of restitution is inappropriate in a case.

(5) The court may order that restitution be made to:

\* \* \*

(iii) A third-party payor, including an insurer, which has made payment to the victim to compensate the victim for a property loss or pecuniary loss under this subsection.

See Md.Code Ann. (1957, 1996 Repl.Vol., 1999 Supp.), Art. 27, § 807. In interpreting a statute, our principle goal is to identify and effectuate the legislative intent. *See Fister v. Allstate Life Ins. Co.,* 366 Md. 201, 211, 783 A.2d 194, 200 (2001); *Tipton v. Partner's Mgmt. Co.,* 364 Md. 419, 434, 773 A.2d 488, 497 (2001)(quoting *State v. Bell,* 351 Md. 709, 717, 720 A.2d 311, 315 (1998); *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995)). We look first to the actual language of the statute and where the ordinary and plain meaning of the language is clear and unambiguous, we implement the statute as it is written. *See Holbrook v. State,* 364 Md. 354, 364, 772 A.2d 1240, 1246 (2001); *In re Anthony R.,* 362 Md. at 57, 763 A.2d at 139–40; *Jones v. State,* 336 Md. 255, 261, 647 A.2d 1204, 1206–07 (1994).

The provision regarding restitution to third-party payors was added in 1982[21] in response, in part, to our decision in *Montgomery v. State*, 292 Md. 155, 438 A.2d 490 (1981), which held that Article 27, Section 640, the restitution statute at that time of the *Montgomery* opinion, did not permit court-ordered restitution for private insurance companies.[22] *See id.* at 161, 438 A.2d at 493. The provision now permits restitution to "[a] third-party payor, including an insurer, which has made payment *to the victim to compensate the victim* for a property loss or pecuniary loss under this subsection." Md.Code, Art. 27, § 807(a)(5)(iii) (emphasis added). While pecuniary loss, as a result of medical expenses, certainly falls under this provision, it is clear, when examining this provision in the context of others in the section, that the Legislature intended to compensate *the victim* for direct out-of-pocket losses. *See* Md.Code, Art. 27, § 807(a)(1)(ii)(providing compensation to the victim for "actual medical, dental, hospital, counseling, funeral, burial expenses, *any other direct out-of-pocket losses* . . . .")(emphasis added). Payments made by an insurance company to the hospital, pursuant to an insurance coverage contract, are not a victim's direct out-of-pocket losses for which he or she can be compensated.

Furthermore, restitution in this situation could not be for payment *made to the victim to compensate the victim* because, quite simply, the insurance company never made a payment to the victim to compensate the victim for his pecuniary loss. Restitution, in this case, could only be said to be for

---

21.  *See* 1982 Md. Laws, ch. 477.

22.  At the time of the *Montgomery* decision, Article 27, Section 640 provided, in pertinent part:

>  (b) *Restitution may be ordered upon conviction of certain crimes.*— Upon conviction for a crime where property of another has been stolen, converted, unlawfully obtained, or its value substantially decreased as a direct result of the crime, or where the victim suffered actual medical expenses, direct out of pocket losses, or loss of earning as a direct result of the crime, the court may order the defendant to make restitution in addition to any other penalty provided for the commission of the crime.

Md.Code (1957, 1976 Repl.Vol., 1980 Cum.Supp.), Art. 27, § 640.

the pecuniary loss of the insurance company under the legitimate terms of the contract into which it entered with the insured. We refuse to read any broader the language of the Legislature, so apparently carefully constructed to avoid such situations. As we have stated, "where the Legislature in a statute expressly authorizes a particular action under certain circumstances, the statute ordinarily should be construed as not allowing the action under other circumstances." *Mossburg v. Montgomery County,* 329 Md. 494, 505, 620 A.2d 886, 892 (1993). Thus, where this statute expressly authorizes restitution to third-party payors, such as insurance companies, for payments made to the victim to compensate the victim for property or pecuniary loss, we shall construe the statute as not allowing restitution in other circumstances.

## IV. Conclusion

For the reasons discussed above, we shall reverse the judgment of the Court of Special Appeals with instructions to that court to reverse the District Court of Maryland, Montgomery County, sitting as a juvenile court. The petitioner did not waive his right to object to the Rule 11–114 violation and the circumstances of the violation in this case warrants dismissal. Furthermore, the juvenile court erred in ordering the petitioner to pay restitution to the victim's insurance company for payments the company made directly to the hospital because such restitution is not expressly permitted by the language of Article 27 Section 807.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE DISTRICT COURT OF MARYLAND AND TRANSFER THE CASE TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY WITH INSTRUCTIONS TO DISMISS THE JUVENILE PETITION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT.*

RAKER, Judge, concurring in part, dissenting in part, joined by BELL, Chief Judge.

I join the judgment of the Court and join in Part III C of the majority opinion insofar as it reverses the judgment of the District Court, sitting as a Juvenile Court in Montgomery County, on the grounds that the court erred in ordering petitioner and his mother to pay restitution to Kaiser Permanente, the medical insurer in this case. I agree that Maryland Code § 3–829 (1996, 1998 Repl.Vol., 2001 Supp.) of the Courts and Judicial Proceeding Article does not permit a court to award an insurer restitution when the insurer did not directly compensate the victim. Unlike the majority, however, I would affirm the judgment of the District Court adjudicating Ryan S. as a delinquent. Accordingly, I respectfully dissent from the judgment of the Court dismissing the delinquency petition.

A preliminary comment is in order regarding the tone of the majority opinion. In this case, the Court's stern rebuke to the District Court has little precedential value inasmuch as the disjointed nature of juvenile trials is unlikely to reoccur in the future now that juvenile proceedings in Montgomery County have been transferred from the District Court to the Circuit Court. The Circuit Court has the resources, including the back-up judges, to assist in the event a case carries over to the next day. Such resources previously were unavailable to the District Court. This Court administers a stronger dose of medicine than is warranted since the "epidemic" is over. In my view, the Court uses unnecessary and unwarranted harsh language to admonish and take to task a hard-working bench in a matter that is unlikely to be repeated in the future.

The judge in charge in the District Court, Juvenile Division, was far from cavalier about the problems in scheduling. The majority glosses over the judge's explanations and concerns for the delays of the trial. For example, the court expressed *"distress that this case can't be heard sooner, I wish that it could ... But, unfortunately, ... we have been given termination of parental rights cases, which are long, drawn out, protracted proceedings that all of our calendars are getting*

*filled up with those kinds of cases."* The court did not "place the rigidity of its docket ahead of the rights of an accused delinquent." Maj. op. at 48. If the court continued to hear the case of Ryan S. in lieu of a previously scheduled delinquency, termination of parental rights or CINA case, all of which have time constraints, another juvenile's rights would suffer.

I think it patently unfair for this Court to suggest that the trial judge simply was unwilling to move other cases to accommodate the requirements of Rule 11–114 or that the court was unconcerned about the scheduling of this case. The judge was keenly aware "about the administration of the court" and the fact that, if this case was heard to completion, other equally pressing cases would be bumped from the docket. The judge raised the scheduling problem, and offered to sit until eight o'clock in the evening, much to the chagrin of defense counsel. After the judge raised the scheduling issue, the following exchange occurred:

"[DEFENSE COUNSEL]: Yeah, that's fine. We're not complaining, we're happy. Are we happy? Oh, we're not happy.

COURT: Well, I got some bad body language.

[SECOND DEFENSE COUNSEL]: I just made a face about the eight o-clock part.

COURT: We have to, we have to finish this case in one more trial session, we really do."

The majority asserts that "there is no evidence on the record that reflects that honoring the petitioner's right to a timely adjudication would have prevented the court from honoring another juvenile's right to a timely adjudication, save the mere assertion by the juvenile judge that the court had several termination of parental rights cases on its docket. Again, a specific explanation of the exigencies of the competing cases in the court's triage is necessary before we will accept a crowded court dockets as a basis for denying a juvenile his right to a timely adjudication." Maj. op. at 48. The characterization of the judge's concerns as a "mere asser-

tion ... that the court had several termination cases on its docket" evinces a lack of understanding of a busy trial court and the challenges inherent in court administration.

On September 16, 1998, the assistant state's attorney and defense counsel appeared before the Circuit Court for Montgomery County, Administrative Judge Paul Weinstein presiding, at a hearing on petitioner's Petition for a Writ of Habeas Corpus. At the habeas hearing before the Circuit Court, defense counsel explicitly told Judge Weinstein about the juvenile court docket problems. The tape recorded record of that hearing reveals as follows:

"[A]t your Honor's urging, we tried to see if [the judge in charge] could find us a date within 30 days. [The judge in charge] said that that is not possible without violating some other juvenile respondent's rights, and that he was not willing to do that. *He said that they looked at every date in the calendar to see if it was possible to comply with this rule, and that he was not able to do it.*"

*See Ryan [S]. v. Alfred Noyes Children's Center,* Circuit Court for Montgomery County, Misc. Pet. No. 13288, recording of hearing. Defense counsel also told Judge Weinstein that the Juvenile Court had offered him one day in the middle of November. Ryan's counsel rejected the November date offered by the District Court because he had another trial scheduled for that date, and he believed that two consecutive days were necessary. Thus, it was not solely the juvenile court's crowded docket, but also Ryan's attorney's schedule, that contributed to the delay of Ryan's hearing.

Turning to the sanction imposed by the Court, I do not believe that the delinquency petition should be dismissed for two reasons: first, petitioner waived the argument that his hearing was so disjointed as to deny him a fair and expeditious adjudication; and second, petitioner was not prejudiced. The Court of Special Appeals, in affirming the judgment, held that, "[a]lthough we are concerned about the protracted and disjointed nature of the proceedings in this case, Ryan's failure to timely raise the continuity argument below has resulted in a waiver of that issue on appeal." *In re Ryan S.,* 139 Md.App.

94, 111, 774 A.2d 1193, 1202 (2001). I do not condone the protracted and non-sequential nature of the proceeding, but I agree with the Court of Special Appeals that the issue was waived.

On the question of waiver, the majority maintains that "the petitioner, without question, alerted the court to his concerns about the lack of continuity and the duration of the delays between the hearings." Maj. op. at 35.[1] I read the record differently, as did the Court of Special Appeals. The majority is incorrect when it says that "[t]he Court of Special Appeals glossed over the basis for, and significance of, the petition for writ of habeas corpus by improperly qualifying the petitioner's motion as an objection 'solely on the ground that he was being detained,' when it is clear from the record that the length of time between hearings was also a crucial element of his argument." Maj. op. at 40. Moreover, the majority's account of the habeas corpus proceedings is inaccurate, speculative, and based on an incomplete record.[2]

---

1. The problem with the majority's analysis is that it does not distinguish between two distinct bases for objection, one under Rule 11–114(b)(1) and the other under 11–114(b)(2). Stated succinctly, 11–114(b)(1) creates a juvenile's right to an adjudicatory hearing within a specified period following service of the juvenile petition. Under Rule 114(b)(1), the hearing need not be completed within 30 days, but must be commenced within that time period, although there is case law to the effect that the hearing must be completed with a reasonable degree of continuity, meaning that, where possible, it must continue on a day-to-day basis. *See In re Vanessa C.*, 104 Md.App. 452, 656 A.2d 795 (1995). Rule 11–114(b)(2), on the other hand, addresses a juvenile's right to be released if a hearing is not held within thirty days from the date on which the court ordered continued detention. Rule 11–114(b)(1) and 11–114(b)(2) create different rights, and neither the Rules nor case law suggest that an objection made under 11–114(b)(2) constitutes an objection under 11–114(b)(1), or *vice versa.*

   The majority incorrectly reasons that petitioner's objection to continuous detention, raised under 11–114(b)(2), was the equivalent to an objection to the nonsequential nature of the trial under 11–114(b)(1). I am unconvinced by the majority's attempt to cobble together an objection under 11–114(b)(1) from petitioner's repeated objections to his detention in violation of 11–114(b)(2).

2. The majority misstates the "verbal order" of Judge Weinstein. The Circuit Court did not order the juvenile court to "re-schedule the date

A reading of the habeas petition supports the Court of Special Appeals interpretation, as does the fact that the petition was withdrawn by defense counsel, and dismissed by the Circuit Court, upon Ryan's release from detention.[3] The habeas petition, filed in the Circuit Court for Montgomery County, prayed *only* that the Circuit Court "order his immediate release from detention with appropriate conditions." *See Ryan [S]. v. Alfred Noyes Children's Center,* Circuit Court for Montgomery County, Misc. Pet. No. 13288.

Throughout the hearings, Ryan's concern with the scheduling was that he was detained at the Noyes Children's Center, not that he was denied a timely and expeditious hearing. Judge Peter Krauser, writing for the Court of Special Appeals, stated:

"The record shows that Ryan objected to the delay of his adjudicatory hearing solely on the ground that he was being detained at the Noyes Children's Center in violation of Rule 11–114(b)(2). He did not at that time claim that such a delay constituted a violation of due process or a violation of subsection (b)(1) of that Rule. In fact, Ryan *never* moved for an expedited hearing, as the circuit court had originally

---

of the hearing within thirty days of September 10, 1998" but instead focused on the proper aim of a writ of habeas corpus, *i.e.,* to release a person from unlawful detention. The court told counsel to

"tell the [judge in charge] that if he does not set a hearing to conclude this matter within 30 days of September the 10th, that come Monday, I'm releasing Mr. S. on certain conditions. And, you can relay to [the judge in charge] that he better establish some procedures to get these people who are incarcerated before the Court as ordered . . . as directed by the statute. Otherwise, he's going to get a rash of orders from this Court ordering him to do it."

3. The majority downplays the fact that when the District Court released Ryan from detention, Ryan's counsel filed in the Circuit Court a Motion to Dismiss Petition for Habeas Corpus, requesting the court dismiss the petition for writ of habeas corpus as moot because he was released on electronic monitoring and that "he [was] no longer being detained illegally." Contrary to the majority's claims, the length of the hearing was raised only as a basis for Ryan's release from detention, not as a complaint that Ryan was denied a fair or speedy adjudication.

suggested he do, nor did he move, at that time, for a mistrial based on Rule 11–114(b)(1)."

*In re Ryan S.*, 139 Md.App. at 111–112, 774 A.2d at 1203 (emphasis added).

On December 14, 1998, Ryan moved for the first time for a mistrial. The sole ground for the motion was that the tapes of the earlier proceedings were unintelligible and, therefore, he could not adequately prepare for his re-cross-examination of Dent. He never suggested to the court that the disjointed. nature of the hearing violated his right to a fair trial. After listening to the master tapes, the court denied that motion with the understanding that Ryan's counsel would be afforded the opportunity to review the master tapes before Dent resumed testifying.[4]

The next day, December 15, 1998, the court indicated that the case would not conclude on that date. No objection was made by defense counsel to continuing the hearing to January 13, 1999. In fact, defense counsel stated that a continuance until January 13, 1999 was "fine." The court suggested to counsel that, when the case resumed on January 13th, 1999, the proceedings last until 8:00 p.m., if necessary, to conclude the hearing.

When the hearing resumed on January 13, 1999, Ryan moved for a mistrial, alleging for the first time the denial of his right to a fair trial because of the protracted and disjointed nature of his adjudicatory hearing. As alternative relief, petitioner's counsel requested that the court "review, or listen to the entire tape of the proceedings in this matter." Denying the mistrial motion, the court stated, "I have been taking very good notes in the case, and if . . . when it comes down to it, I

---

4. The majority finds that the "audio recordings of the hearings failed to capture significant portions of the petitioner's cross-examination of the witnesses." Maj. op. at 33 n. 8. This is misleading because it is clear from a reading of the record as a whole that counsel was referring to *his* cassette copy of the record, not the official court recording, which provided a complete and audible record of the entire proceedings. The trial court offered defense counsel an opportunity to listen to the master tape recording of the proceedings.

don't feel that I [can] make a decision without reviewing the tapes, I will do so." The hearing concluded and the court deferred its ruling until January 21, 1999.

When the proceedings resumed on January 21, 1999, Ryan renewed his motion for mistrial and also moved to dismiss the charges. The court denied both motions, noting that there was "extraordinary cause" to justify the multiple continuances in the case because the "Court's calendar simply could not possible accommodate it."

The Court of Special Appeals was correct in finding waiver. Judge Krauser noted:

"In the case *sub judice*, Ryan waited until January 21, 1999, following five days of testimony and two continuances, to move unconditionally for a mistrial or a dismissal of his case. By waiting to object to the disjointed hearing procedure until the final day of the adjudicatory hearing when all that remained was the court's rulings Ryan gave the court no opportunity to possibly correct any errors in the proceedings. Had Ryan filed a motion for expedited hearing, as the circuit court had suggested on September 11, 1998, or moved earlier for a mistrial or dismissal, the circuit court could have addressed his concerns and rescheduled his case to an earlier date."

*In re Ryan S.*, 139 Md.App. at 113, 774 A.2d at 1203–1204 (internal quotation marks and citations omitted). After reviewing the record, I am also unable to find any objection to the disjointed nature of petitioner's hearing before the final day of the hearing.

Turning to the remedy crafted by the Court, perhaps there was not extraordinary cause for the continuances granted by the trial court. But, even assuming extraordinary cause was lacking, dismissal is unwarranted. Ryan's case was not prejudiced by the witness's death. He was not an eyewitness to the criminal event or to any material aspect of the case, and as the Court of Special Appeals noted, his testimony had no bearing on the primary issue of whether Ryan acted in self-defense.

In any event, without objection, there was an agreement as to his testimony. Petitioner has shown no prejudice.[5]

As a basis for dismissal, the majority states that "the lack of continuity in the petitioner's adjudicatory proceedings inherently prejudiced his ability to obtain a fair adjudication in that the finder of fact was forced to pass judgment based on facts established in evidence from half-day hearings held four months before." Maj. op. at 52. Unless the majority is implying that petitioner was denied a fair trial because the trial judge ruled on facts gleaned from nonsequential hearings held over four months, and therefore, he could not remember the facts of the case, I fail to see the relevance of the statement. It seems to me that the majority disguises its refusal to accept the judge's word that he had taken steps to ensure that he was familiar with the salient facts and issues in petitioner's case by stating that the Court has "confidence in [the hearing] court's ability to recall such evidence." Maj. op. at 52. Despite the Court's professed confidence in the trial judge, the majority concludes that "the ills of an inherently disjointed process" were not entirely remedied by the hearing judge's actions. *Id.* I suggest that the trial judge recalled all the facts and petitioner was not denied a fair hearing simply because there was a delay in the hearings.

The record shows that the trial judge had a firm grasp on the facts and legal issues. In delivering his opinion, he candidly explained his preparation as follows:

"To that end, I did obtain tape recordings of the trial, and . . . I have listened to, not the entirety of the testimony, but that, those parts of the testimony that I felt to be crucial to making a determination in this case. And, to that end, I listened to the testimony of Mr. Dent, both on direct and cross as relating to the events of February 4th.

---

**5.** The Court discusses personal prejudice allegedly suffered by Ryan S. as a result of the delay. Maj. op. at 52, n. 19. Petitioner's mother told the Circuit Court that Ryan was 17 years old, that he was not in school, that he had a job offer and that he was planning to enroll in a GED program. There is no evidence that the disjointed nature of the hearings contributed to his less than bright situation.

With respect to the other incidents in Mr. Dent's life, I did not listen to those, I reviewed my notes, they were detailed. I also ... the, in effect rebuttal or the Respondent's witnesses, who addressed those same issues testified much later in the trial, and their testimony was very fresh. So, if anything, that testimony which was foremost in my mind was ... the alternate versions or supplemental versions of those events.

But, with respect to the events of Dec ... February 4th, 1998, I did listen carefully to ... both the direct and the cross ... redirect of Mr. Dent. I also compared them with my notes and found that ... I was happy to note that my notes were, were very accurate as to the testimony of Mr. Dent.

I listened also to the testimony of Linda [S]. as relating to the events of February 4th. The testimony of Ryan S., I did not listen to, because I had heard it live, just only a week ago, again, had very good notes on that and did not feel that that was necessary, nor was that even really part of the motion."

In addition, Ryan S was not detained for eight months, as represented in the majority opinion. *See* Maj. op. at 51. Ryan was initially charged on February 4, 1998, as an adult with the charge of attempted second degree murder. He then disappeared for three months, finally turning himself in to the police on May 11, 1998. Pursuant to a request by petitioner's counsel, Ryan was released on electronic home monitoring on September 18, 1998. Other than the mere possibility that electronic monitoring and home detention may restrict a person's movements and employment, school attendance or other choices, there is no evidence in this record that Ryan's opportunities for employment or schooling were restricted. I do not minimize a four month period of detention; however, the facts are not as egregious as the majority represents.

Finally, I address the last basis for the majority's decision: that the Montgomery County Juvenile Court suffers from a chronic inability to hear juvenile cases in a reasonably continu-

**66**

ous manner. *See* Maj. Op. at 44. Assuming that the District Court repeatedly scheduled cases "to beat the clock" under Rule 11–114, the "practice" is over. As we said in *In re Keith W.,* 310 Md. 99, 527 A.2d 35 (1987), only the most extraordinary and egregious circumstances should be allowed to dictate dismissal as the sanction for the violation of a procedural rule. *Id.* at 109, 527 A.2d at 40. In my view, without any demonstration of real, not manufactured, prejudice, dismissal is inappropriate. Petitioner was not denied a fair adjudicatory hearing by what I concede is an undesirable practice, and the extreme sanction of dismissal is unwarranted.

Chief Judge BELL has authorized me to state that he joins in the views expressed herein.